UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | | |
|---|---|---|---|
| John Doe, | ) | | |
| | ) | | |
| Plaintiff, | ) | No. _____ | |
| | ) | | |
| v. | ) | **JURY DEMAND** | |
| | ) | | |
| Lincoln Memorial University, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## Verified Complaint

NOW COMES Plaintiff, John Doe[1] ("Doe"), by and through the undersigned counsel, and brings this lawsuit against Defendant, Lincoln Memorial University ("LMU") and for his Complaint, states as follows:

## Parties

1.      Doe is an individual domiciled and residing in the City of St. Charles, County of Lee, State of Virginia. Doe is a resident and citizen of the State of Virginia for the purposes of 28 U.S.C. § 1332(a)(1).

2.      LMU is a corporation organized and existing under the laws of the State of Tennessee and having its principal place of business in the City of Harrogate, County of Claiborne, State of Tennessee. LMU is a university comprised of ten divisions identified as "colleges" or "schools," including, but not limited to, the "Debusk College of Osteopathic Medicine." LMU is a citizen of the State of Tennessee for the purposes of 28 U.S.C. § 1332(a)(1).

3.

---

[1] Plaintiff is filing a Motion to Proceed Under a Pseudonym contemporaneously with this verified complaint.

1

**Jurisdiction and Venue**

4.     Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

5.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331(a) because Doe asserts a claim under Title IX of the Education Amendments of 1972 as codified in 20 U.S.C. § 1681 et seq.

6.     Jurisdiction in this Court is proper under 28 U.S.C. § 1367(a) because Doe's state law claims are so closely related to his federal law claims as to form the same case or controversy under Article III of the United States Constitution.

7.     Venue in this Court is proper under 28 U.S.C. § 1391(a) because LMU is a resident of this judicial district and a substantial part of the events giving rise to the action occurred in Harrogate, Tennessee.

8.     This Court has personal jurisdiction over LMU because Doe's claims arise out of LMU's conduct in this judicial district, and because LMU has its principal place of business in this judicial district.

**Factual Background**

**Doe's background.**

9.     Doe is a native of rural Appalachia. Doe grew up in Lee County, VA, one of the poorest counties in Virginia, attended underperforming public schools, and overcame substantial financial hardship to pursue a medical education.

10.     Doe is the first in his family to pursue any education past high school, let alone professional school.

Case 3:20-cv-00315   Document 1   Filed 07/16/20   Page 2 of 23   PageID #: 2

11.     Doe's parents divorced when Doe was in the third grade, and his father left to start a different family. Doe lived with his mom after the divorce, and, when she later remarried, he had a good relationship with his stepfather. Doe had little contact with his father.

12.     Although Doe's stepfather genuinely cared for Doe and his siblings, both his stepdad and his mom abused drugs and alcohol, and they were never able to provide much for the family. Doe's mother would take her kids with her to buy cocaine, and as a child Doe watched her shoot up numerous times.

13.     Doe and his siblings were stigmatized in school as poor kids who would never amount to anything. In high school, Doe's academic performance was mediocre at best, although he did compete in sports. Some of Doe's teachers told him to his face that he was a failure.

14.     During Doe's junior year of high school, the family's situation worsened when his stepdad was murdered by the stepdad's own brother. Doe's mother could not cope with the loss. Her drug use increased, and she moved out to live with a boyfriend, leaving her four children to take care of themselves.

15.     When Doe was a senior, he was almost killed in a car accident. He was thrown from the back of a truck, and his injuries required plates and screws in his face. He managed to graduate from high school in 2002, with no plans for college, and started working in a factory.

16.     Thereafter, Doe was introduced to a community leader in Tazewell, Tennessee, who saw promise in Doe and encouraged him to go to college. In 2006, Doe began attending Walters State Community College. After graduating from Walters State, he attended and ultimately graduated from ETSU.

17. While at Walters State, Doe learned about Remote Area Medical (RAM). Doe started volunteering at RAM clinics, something he has continued to do ever since. RAM provides much-needed medical services to extremely poor areas of rural Appalachia.

18. In part because of his experience with RAM, Doe decided to pursue medicine, with the aim of becoming a family doctor who serves poor communities in Appalachia.

**LMU's background and mission statement.**

19. LMU is a corporation engaged in the education of students in multiple disciplines including, but not limited to, the study of medicine.

20. As the LMU-DCOM Handbook ("the Handbook") states, although the school serves students throughout the state, nation, and other countries, it "retains a commitment to enrich the lives of people in communities of the Appalachian region." Handbook at 6.

21. LMU-DCOM is focused on enhancing "access to comprehensive health care of underserved communities." Handbook at 7-8.

**Doe's acceptance by LMU-DCOM.**

22. Doe is uniquely positioned to fulfill LMU-DCOM's mission. Doe grew up in an "underserved" community in Appalachia, and he is committed to working in and for those communities.

23. Recognizing Doe's connection to Appalachia and desire to serve the region in his medical practice, LMU offered Doe a position as a medical student at DCOM.

24. Doe began as a medical student at LMU in the summer of 2015.

25. A contract between LMU and Doe existed during the entirety of Doe's tenure as a medical student at LMU.

26.     The Handbook detailed the terms of the contract between Doe and LMU. A copy of the Handbook is attached **as Exhibit 1**.

**Relevant provisions of the LMU-DCOM Handbook.**

27.     Under the Handbook, before LMU-DCOM's Student Progress Committee (SPC) holds a hearing on a charge of misconduct, the student charged "will be given a summary of the allegations and the names of the complainant and witnesses." Handbook at 101. Also, "[a]t least three days prior to the start of the [SPC] meeting, the student will be shown any written documentation pertaining to the case." Handbook at 102.

28.     After the student has been afforded the opportunity to review any written documentation pertaining to the case, and after evidence is presented to the SPC, the Handbook provides that the student accused of misconduct shall have an opportunity "to present his or her version of the events in question to the committee." Handbook 102.

29.     Under the Handbook, "[t]he level of proof for a [SPC] decision shall be substantial evidence." Handbook at 101. As the reference to "evidence" indicates, SPC's deliberations are supposed to occur only after "the presentation of the evidence." Handbook at 102. Under the rules, part of that evidence includes statements from "[t]he complainant and any witnesses." *Id*. For this phase, although respondent is not present, SPC may ask the complainant questions. *Id*.

30.     During deliberations on whether there is "substantial evidence" that misconduct has occurred, SPC is not to consider "[a]ny previous disciplinary problems." Handbook at 102. "[A]ny prior disciplinary problems will be provided to the committee" only after it has found misconduct and the hearing "move[s] into the penalty phase." *Id.*

**Doe's performance at LMU.**

31.     Doe overcame early academic struggles to pass all his classes at LMU and otherwise complete all academic obligations prior to January 6, 2020.

32.     Doe passed both of his Board Exams on the first attempt.

33.     Despite the demands of the medical school curriculum, Doe continued to serve at RAM clinics. His connection with RAM was widely recognized. Last year, when DCOM was applying for a distinguished chapter award from the Gold Humanism Honor Society, Rick Slaven, LMU-DCOM's Coordinator of Student Advancement, asked Doe to reach out to RAM about writing a letter of support for DCOM. DCOM's application was successful, and it was the first school of osteopathic medicine to receive the award.

34.     Doe performed well in his clinical rotations. Of the 15 rotations he completed, Doe received one B and 14 As. For each rotation, the clinical teacher or "preceptor" ranked each student's performance in various categories, including teamwork, ethics, and professionalism. Doe was never ranked "inadequate" in any category in any of his rotations, and most of his rankings were "excellent."

35.     By January 2020, Doe had completed all requirements needed to graduate except six clinical rotations, and he had begun applying for a residency.

36.     Doe has a strong likelihood of matching with a residency program. After Doe applied for a residency, he received 16 different interviews for residency programs, including programs in New York, Mississippi, and Iowa. LMU-DCOM's Director of Career Services told Doe that there was a "100% chance" that he would match.

37.     Doe must be enrolled as a medical student prior to September 15, 2020 to match with a residency program.

38.     Doe has paid $350,000 in tuition and related educational expenses in consideration of the university-student contract between him and LMU.

**The anonymous complaint.**

39.     In December 2019, Doe started a rural outpatient rotation with the University of Kentucky residency program at Hazard Appalachian Regional Hospital.

40.     On December 20, 2019, Doe was told by a doctor in the program that a complaint had been made against him and that he was being taken off the rotation. Doe was not told anything about the nature of the complaint or who made it.

41.     On the same day he received the news from the hospital, Doe contacted Dr. Loyke, LMU-DCOM's Associate Dean of Clinical Affairs. Dr. Loyke told Doe to wait for the results of an internal investigation by the hospital and not to go into work.

42.     A day or so later, Doe contacted the hospital's HR and Risk Management departments to try to get more information, but he was informed that the hospital was not investigating the issue.

43.     On or about December 23, 2019, Doe informed Dr. Loyke that the hospital was not conducting any internal investigation. Dr. Loyke scolded Doe for inquiring with the hospital. During this conversation, Dr. Loyke indicated that the complaint had to do with an allegation of some sort of sexual harassment or inappropriate flirtation. When Doe denied engaging in any such conduct, Dr. Loyke said that he did not believe that a woman would "make up" an allegation of harassment, and he compared Doe's asserting his innocence to a "murderer" or "rapist" attacking the credibility of his accuser even when he is "guilty."

44. On January 2, 2020, Doe received an email from Ms. Robin Mace, LMU-DCOM's Associate Director of Admissions. On information and belief, the email was drafted, at least in part, by Dr. Loyke.

45. The email stated that Doe was required to present to the Student Progress Committee ("SPC") on Monday, January 6, 2020 at 9:00 a.m. in order to address complaints "of unprofessional behavior in violation of the LMU-DCOM policy." The email further stated that "[t]he most recent complaint involves inappropriate/sexual and 'flirty' comments made to nursing staff during your most recent rotation. This is very similar to complaints made against you approximately five months ago. This complaint is one of a number of complaints regarding your behavior and it is most alarming. . . . You were also before the SPC in August of 2019 for unprofessional behavior that resulted in a letter of reprimand."

46. The stated purpose of LMU-DCOM's Student Progress Committee (SPC) "is to ensure that every graduate of LMU-DCOM has the skills, knowledge, and judgment to assume the responsibilities of an osteopathic doctor." Handbook at 61. The SPC is appointed by the Dean of LMU-DCOM and is composed of faculty members and the Dean of Students (non-voting, ex-officio member). *Id.*

47. The Dean of LMU-DCOM makes the final decision to uphold or reverse the recommendations of the SPC. Handbook at 63.

**The prior complaints referenced in Ms. Mace's email.**

48. The reference, in Ms. Mace's email, to "complaints" made "five months ago" was a reference to a complaint investigated by LMU's Title IX Office in the summer of 2019.

49.     In July 2019, an employee at a hospital where Doe had completed a rotation in early 2019 alleged that, in January or February 2019, Doe bumped into her or touched her intentionally in a manner she alleged was sexual. Doe denied having had any contact with her.

50.     Doe provided the investigator with information about his schedule in the relevant period, which indicated it was unlikely he would have been on the floor where the complainant worked. And the preceptor for the rotation told the investigator that, during the rotation, most of Doe's time was with the preceptor and Doe had no relationship with the complainant. The complainant declined to be interviewed.

51.     The investigator determined that "the preponderance of the evidence indicates that respondent **DID NOT** violate the LMU policy," and the investigation was closed.

52.     Despite the investigator's determination, Dr. Loyke told Doe before the SPC meeting that he did not believe the findings of the Title IX investigation, even though Dr. Loyke, on information and belief, had not reviewed the investigator's report. Dr. Loyke told Doe that "no one," in reference to the female complainant in the summer 2019 Title IX investigation, "would just make up stuff like that."

53.     Dr. Loyke's opinion contradicted both the conclusions of LMU's own Title IX investigator and the affirmative evidence presented by Doe and the preceptor from the rotation.

54.     The January 2, 2020 email from Ms. Mace also referred to a "letter of reprimand" after an SPC meeting in August 2019.

55.     The August 2019 SPC meeting concerned an allegation by a nurse practitioner essentially that, during Doe's behavioral health rotation, he did not show up for work on several occasions and that he showed up, on other occasions, in "regular clothes" to talk to staff members. The preceptor for this rotation thought that this allegation was baseless and offered to speak to

SPC about it. Indeed, this preceptor gave Doe an A and, in his evaluation, described him as "diligent."

56.    After the August meeting, Doe received a letter summarizing SPC's decision as follows: "The SPC recommended no action be taken regarding this matter except to send you this letter to remind you of the importance of communication and professional behavior." The letter did not say that Doe was being "reprimanded," nor did it indicate that SPC determined that Doe acted unprofessionally.

**The January 6, 2020 SPC hearing.**

57.    The email from Ms. Mace did not provide any information about the allegation of "flirty" comments during Doe's December 2019 rotation, such as what Doe supposedly said or when and where he supposedly said it. Nor did Ms. Mace's email identify the complainant.

58.    Doe appeared before SPC on January 6, 2020. On that day, SPC was composed of eleven LMU-DCOM faculty members. Dr. Loyke served as an ex-officio member of SPC during Doe's hearing.

59.    Although SPC appeared to have a folder of documents concerning the allegation, Doe was not told anything about the allegation beyond the limited information in Ms. Mace's email.

60.    The complainant was not present for any portion of Doe's SPC hearing, and, on information and belief, never addressed SPC.

61.    Relying on the anonymous allegation of sexual harassment, SPC immediately asked Doe to explain why he had been dismissed from two rotations within the past year.

62.     Doe denied engaging in any improper conduct. He asked SPC to provide him with examples of the supposedly inappropriate comments he was alleged to have made during the December 2019 rotation. SPC did not do so.

63.     Doe also told the Committee that if SPC thought that he was making comments that were being misconstrued, he was willing to receive professionalism training in Harrogate. Doe emphasized that he would not have knowingly done anything to jeopardize what he had worked for ten years to achieve, especially since he was only a few months from graduation. Doe also discussed with SPC the positive evaluations he had received for all his clinical rotations.

64.     From the outset of the meeting, SPC appeared to have already decided that Doe had made whatever comments had been alleged. It never told him, however, what the alleged comments were.

65.     SPC told Doe that the committee already knew the reasons Doe was being pulled off the rotation and asked "what he wanted them to hear."

66.     No member of SPC asked Doe any further clarifying questions during the meeting.

67.     SPC appeared to believe, incorrectly, that Doe had already been told what he was supposed to have said or who the complainant was. In any event, SPC never discussed the specific allegations with Doe. The meeting lasted no more than 15 minutes.

68.     After Doe left the room, a member of SPC immediately moved to dismiss Doe from LMU-DCOM. The motion carried.

**The January 6, 2020 meeting with Dr. Kessler and Dr. Loyke.**

69.     That same morning, Doe was summoned to a meeting with Dr. Kessler, Dean of LMU-DCOM. Dr. Loyke was also present during Doe's meeting with Dr. Kessler.

70.     Dr. Kessler told Doe that SPC had recommended dismissal and that he was going to uphold the recommendation.

71.     Dr. Loyke, explaining SPC's recommendation and Dr. Kessler's decision, stated that he had no doubt about the truth of the anonymous allegation in December 2019 because it fit what Dr. Loyke and Dr. Kessler saw as a pattern of behavior.

72.     As evidence of the supposed pattern of unprofessional conduct, Dr. Loyke again noted the allegation from the summer of 2019, which LMU's own Title IX investigator had investigated and found Doe not responsible for any violation of LMU policy.

73.     Neither the complainant from the summer nor the anonymous complainant in December had ever appeared before SPC, much less been cross-examined. Dr. Loyke stated, however, that he "does not have to see it snow to know, when he looks out at his car in the morning, that it did."

74.     When Doe asked for information about the current complaint, it became apparent that Dr. Kessler and Dr. Loyke believed that Doe had already been provided with the specific allegations. That was inaccurate, and Doe tried to explain to both Dr. Kessler and Dr. Loyke that he still did not know what he was alleged to have said or who made the complaint.

75.     Dr. Kessler then read from a document that Doe had never seen before. The document recounted allegations from a nurse that had been made anonymously. Hearing Dr. Kessler read the document was the first time Doe was told what he was supposed to have said. The document did not identify the complainant.

76.     Unbeknownst to Doe at the time, the document was based on a January 3, 2020 telephone conversation that Dr. Loyke had with the person who made the anonymous complaint. During this telephone conversation Dr. Loyke did not obtain the complainant's identity. Dr. Loyke

purportedly wrote down the complainant's assertions and appears to have provided them to SPC (although not to Doe). On information and belief, the allegations made by the complainant were never investigated, not by the hospital where the comments were supposedly made, and not by LMU.

77.     Doe told Dr. Kessler and Dr. Loyke unequivocally that the anonymous allegations were false.

78.     Doe urged them to investigate. Dr. Kessler acknowledged that he did not know whether the allegations were true but had determined that since the allegations appeared consistent with the allegation from last year, he was going to uphold the dismissal recommendation.

79.     Dr. Kessler did not address why SPC's recommendation was entitled to stand when Doe had not been told what the alleged comments were until after the hearing. Nor did Dr. Kessler address how dismissal could ever be based on an allegation that was anonymous.

**Doe's appeal.**

80.     Doe internally appealed his dismissal by letter to the Appeal Board dated January 9, 2020.

81.     The stated purpose of the Appeal Board is "to determine if LMU-DCOM policies and procedures relating to the case were followed and that no gross misapplication of fact occurred." Handbook at 64.

82.     Doe's appeal explained that he was never shown any written documentation pertaining to the case, contrary to DCOM rules, even though SPC appeared to have a file with several documents. The appeal also pointed out that, when Doe asked Dr. Kessler to explain why he was being dismissed, Dr. Kessler "began reading from a document" that was "not the email" from Ms. Mace and that included allegations that were not in Ms. Mace's email. Also, Ms. Mace's

email and whatever Dr. Kessler read from did not identify the name of the complainant or any other alleged witnesses.

83.     The appeal letter also noted that no complaining witness appeared at the SPC hearing, and that DCOM disciplinary procedures do not authorize decisions based on hearsay. Handbook at 101-02.

84.     In a letter dated January 14, 2020, the Appeal Board affirmed the dismissal decision of SPC and Dr. Kessler. The letter does not specifically address any of the grounds raised in Doe's appeal.

85.     Doe was dismissed from LMU on January 6, 2020. After four years of study and tuition payments, Doe's dismissal occurred just four months before graduation.

## COUNT ONE
**(Violation of Title IX of the Education Amendments of 1972 – 20 U.S.C. § 1681(a))**

86.     Doe restates and incorporates herein all of the allegations in paragraphs 1 - 85.

87.     Title IX states, in pertinent part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance. . . ." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citing 20 U.S.C. § 1681(a) (2020)).

88.     "Title IX is enforceable through a judicially implied right of action, through which monetary damages are available." *Id.* (quoting *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001)).

89.     The private right of action under Title IX is enforceable against any university receiving federal financial assistance. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018).

90.     LMU receives federal financial assistance.

91.     A plaintiff may recover under Title IX where gender bias caused a university to erroneously find the plaintiff guilty of wrongdoing. *Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 886 (S.D. Ohio 2017). The plaintiff must plead both "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and "a particularized . . . causal connection between the flawed outcome and gender bias." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

92.     The facts and procedural irregularities here cast "articulable doubt" about the accuracy of the SPC hearing and LMU's decision to dismiss.  The facts that cast doubt include the following:

    a.  Contrary to the Handbook, LMU relied on an anonymous allegation of sexual harassment made by a female non-student over a male student's in-person;

    b.  Contrary to the Handbook, LMU relied on an allegation without hearing from the complainant directly, much less allowing her to be cross-examined; and

    c.  Contrary to the Handbook, LMU failed to inform Doe of the content of the alleged statement before or during the SPC hearing, depriving Doe of the opportunity to contest whether he made the statement at all.

93.     The facts here also establish that the flawed outcome was causally connected to gender bias.  The facts that show gender bias include the following:

    a.  LMU refused to credit the "No Violation" finding of the summer 2019 Title IX investigation, which evidences a tendency, on the part of LMU, to credit a complaint made by a female over Doe's contradictory evidence, LMU's own Title IX investigator's "No Violation" conclusion, and the evidence presented in Doe's favor by the preceptor for the rotation. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)

15

(noting the inference of gender bias arising, in part, out of the defendant university crediting exclusively female testimony and discrediting exclusively male testimony);

b. LMU employed a double standard of veracity-inquiry in the process leading up to Doe's dismissal. The gender-based double standard was evidenced by LMU's reliance on the anonymous complaint made by a female over a male student's in-person denial. *See id.* (noting evidence of a double standard where the defendant university discounted the credibility of testimony from the plaintiff's fraternity brothers because they were fraternity brothers, but "did not similarly note that several of Roe's witnesses were her sorority sisters. . . .").

c. Dr. Loyke told Doe that he did not believe that a woman would "make up" an allegation of sexual harassment, and when Doe asserted his innocence, compared him to "murderers and rapists."

d. Dr. Loyke, an ex-officio member of SPC, was in the January 6, 2020 SPC hearing and the meeting with Dr. Kessler. Dr. Loyke, through his statements, conveyed the position that Doe was responsible for the conduct that prompted the summer 2019 Title IX investigation. *See Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (identifying "statements by members of the disciplinary tribunal" as evidence by which a plaintiff may "show the [causal] influence of gender."). Dr. Loyke's position directly influenced what SPC took as true and what Dr. Kessler based his decision to dismiss Doe on.

94. Doe was erroneously dismissed in violation of 20 U.S.C. 1681(a) due to the absence of effective investigation of the anonymous complaint and lack of due process protections before and during the SPC hearing.

16

95.     Dr. Kessler's decision to uphold the SPC determination was caused, at least in part, by LMU's willingness to credit anonymous allegations made by a female, against Doe, without allowing Doe to defend himself. *See Baum*, 903 F.3d at 586.

96.     As a result of LMU's violations of Title IX, Doe has suffered damages, including but not limited to the loss of more than $350,000 paid to LMU, lost profits, and lost career opportunities.

## COUNT TWO
### (Breach of Contract)

97.     Doe restates and incorporates herein all of the allegations in paragraphs 1 - 96.

98.     "[T]he student-university relationship is contractual in nature although courts have rejected rigid application of contract law in this area." *Doherty v. S. College of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988).

99.     Therefore, "[a] student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings." *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011).

100.    The terms and procedures set forth in the university handbook help define the contractual relationship between university and student. *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 689 (M.D. Tenn. 2018).

101.    Under the Handbook, LMU had a contractual obligation to respond to disciplinary incidents consistent with the Handbook's terms.

102.    Doe fulfilled his contractual obligation to LMU by satisfying every obligation of the medical degree program prior to his dismissal. Doe was unable to satisfy the requirements of the spring 2020 semester because he was dismissed prior to the start of that semester.

103.    Doe payed over $350,000 in tuition and related educational expenses to LMU as consideration for obtaining a medical degree from LMU.

104.    LMU materially breached its contractual obligation to Doe by relying on an anonymous and unverified allegation of sexual harassment as sufficient to meet the "substantial evidence" of wrongdoing standard required to adjudicate Doe responsible for sexual harassment. *See* Handbook at 101.

105.    LMU materially breached its contractual obligation to Doe by failing to provide Doe with written documentation pertaining to the anonymous complaint, failing to inform Doe of the name of the complainant, and failing to allow Doe an opportunity to present evidence pertaining to the veracity of the allegation against him.

106.    LMU materially breached its contractual obligation to Doe by considering prior disciplinary accusations during the conduct-determination phase of the SPC hearing as opposed to considering them only during the penalty phase.

107.    In Tennessee, every contract contains an implied duty of good faith and fair dealing. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013). *See also* Tenn. Code Ann. § 47-1-203 (imposing an obligation of good faith and fair dealing upon parties in the performance or enforcement of contracts).

108.    In university disciplinary proceedings, the implied covenant of good faith and fair dealing between the university and the student creates a duty to provide "basic fairness." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018).

109.    The Handbook expressly covenanted to provide "fair investigation" in response to any complaint of sexual harassment. Handbook at 88.

110.    In denying Doe notice of the specific factual content of the allegation against him, knowledge of the identity of his accuser, and a meaningful opportunity to be heard and defend himself, LMU materially breached its duty to conduct student conduct proceedings in accordance with "basic fairness." *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016).

111.    The Sixth Circuit has analyzed *Doe v. Brandeis* in the context of a private university disciplinary proceeding noting that refusing "'to provide [the student] with the specific factual conduct alleged to have given rise to the charge. . . .' made it impossible for the student to defend himself. . . ." *See Faparusi v. Case W. Reserve Univ.*, 711 Fed. Appx 269, 274 (6th Cir. 2017) (quoting *Brandeis*, 177 F. Supp. 3d at 604).

112.    When SPC refused to provide Doe with the factual content of what he was alleged to have said during the December 2019 rotation, SPC effectively refused to inform Doe "of the specific factual content of the conduct giving rise to the charge." *Id.*

113.    In failing to afford Doe an effective opportunity to defend himself, LMU breached its duty to conduct disciplinary proceedings in accordance with basic fairness.

114.    As a result of LMU's material breaches, Doe has suffered actual damages, past, present and future, including but not limited to the loss of more than $350,000 paid to LMU, lost profits, and lost career opportunities for which LMU is liable.

## COUNT THREE
### (Negligence)

115.    Doe restates and incorporates herein all of the allegations in paragraphs 1 - 114 .

116.    In Tennessee, "[a] negligence claim requires that a plaintiff establish: (1) a duty of care owed to plaintiff by defendant; (2) conduct falling below that standard of care resulting in a breach of duty by defendant; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal

cause." *Doe v. Univ. of the S.*, No. 4:09-cv-62, 2011 U.S. Dist. LEXIS 35166, at *55 (E.D. Tenn. March 31, 2011) (citing *West v. East Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)).

117.    LMU owes everyone, including Doe, "a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm." *Atria*, 142 F. App'x at 251; *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003).

118.    Conduct creates an unreasonable risk of harm where "the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

119.    To establish proximate cause in Tennessee, a plaintiff must demonstrate that: "1) the tortfeasor's conduct [was] a 'substantial factor' in bringing about the harm being complained of; 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and 3) the harm giving rise to the action could reasonably have been foreseen or anticipated by a person of ordinary intelligence and prudence." *Haynes v. Hamilton County*, 883 S.W.2d 606, 611-12 (Tenn. 1994) (quoting *McClenahan*, 806 S.W.2d at 775).

120.    "Proximate cause, as well as the existence of a superseding, intervening cause, are jury questions unless the uncontroverted facts and inferences to be drawn from the facts make it so clear that all reasonable persons must agree on the proper outcome." *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 905 (Tenn. 1996).

121.    The gravity of harm posed by LMU's failure to investigate an anonymous complaint of sexual harassment is severe because a wrongful sexual harassment conviction could

ruin a medical student's ability to gain acceptance to a residency program, become a licensed physician, and pay back his student debt. *See Atria*, 142 F. App'x at 252.

122.    LMU's failure to investigate the December 2019 anonymous complaint against Doe created an unreasonable risk of harm because the foreseeable probability of, and the gravity of the harm resulting from, a wrongful sexual harassment conviction outweighed the burden on LMU to conduct a thorough investigation of the complaint. *See id.*

123.    The risk that failing to investigate an anonymous complaint could result in a wrongful sexual harassment conviction and wrongful dismissal is foreseeable by a person of ordinary intelligence. *See Haynes*, 883 S.W.2d at 611-12.

124.    As a result of LMU's negligence, Doe has suffered actual damages, past, present and future, including but not limited to the loss of more than $350,000 paid to LMU, pain and suffering, lost profits, and lost career opportunities for which LMU is liable.

<u>**COUNT FOUR**</u>
**(Injunctive Relief)**

125.    Doe restates and incorporates herein all of the allegations in paragraphs 1 - 124 .

126.    As a result of LMU's conduct detailed above, Doe will lose the opportunity to graduate as a Doctor of Osteopathic Medicine and begin a residency, and he will continue to suffer damage to his personal and professional reputation that will preclude him from obtaining professional opportunities in the future.

127.    Doe is entitled to injunctive relief (a) prohibiting LMU from enforcing its decision to dismiss Doe, and (b) requiring LMU to provide him the opportunity to finish his medical studies and graduate as a Doctor of Osteopathic Medicine.

WHEREFORE, Plaintiff prays for judgment against Defendant Lincoln Memorial University as follows:

(1)     awarding Doe injunctive relief requiring LMU to allow Doe to finish his final semester of medical school and graduate with his Doctor of Osteopathic Medicine degree from LMU-DCOM;

(2)     awarding Doe damages against Doe arising from Defendant's erroneous dismissal of Doe in an amount not less than $350,000;

(3)     awarding Doe reasonable attorney's fees in accordance with 42 U.S.C. § 1988(b);

(4)     awarding Doe damages against LMU arising from Defendant's breach of contract with Doe;

(5)     awarding Doe damages arising from Defendant's negligence in failing to investigate the anonymous complaint of sexual harassment leading to Doe's wrongful dismissal in an amount not less than $350,000; and

(6)     granting any other relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury.

Respectfully submitted this 16th day of July, 2020.


RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.


s/James R. Stovall
James R. Stovall [BPR # 032512]
606 W. Main Street, Suite 300
Knoxville, TN  37902
(865) 637-0661
jstovall@rddjlaw.com

22

## VERIFICATION

STATE OF Indiana                 )
                                    :

COUNTY OF Crawford       )

        Before me, the undersigned authority, a notary public in and for the State and County listed above, personally appeared ▇▇▇▇▇▇▇▇▇▇▇▇, referred to in the foregoing Verified Complaint as John Doe, who being sworn according to law deposes and states that the facts set forth in the foregoing Verified Complaint are true to the best of his knowledge, information and belief.



referred to in the Verified Complaint as John Doe

SWORN to and subscribed before me this 14 day of July, 2020.

_Lisa Grant_
Notary Public

My Commission Expires: 12-04-2024

**LISA GRANT**
Notary Public, State of Indiana
[SEAL]
Crawford County
My Commission Expires
December 04, 2024

23