**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **John Doe,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:20-cv-315** |
| | ) | |
| **Lincoln Memorial University,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

JAMES R. STOVALL, BPR # 32512
RITCHIE, DILLARD, DAVIES &
 JOHNSON, P.C.
606 W. Main Street, Suite 300
Post Office Box 1126
Knoxville, TN  37901-1126
Phone:  (865) 637-0661
Fax:      (865) 524-4623
email: jstovall@rddjlaw.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page No.**

Introduction.................................................................................................................................1

Factual Background ....................................................................................................................1

    Doe's Background .................................................................................................................1

    Doe's acceptance by LMU-DCOM ....................................................................................3

    Relevant provisions of the DCOM Handbook....................................................................3

    Doe's performance at DCOM ..............................................................................................4

    The anonymous complaint ..................................................................................................5

    The prior complaints referenced in Ms. Mace's email ......................................................6

    The January 6, 2020 SPC hearing ......................................................................................8

    The January 6, 2020 meeting with Dr. Kessler and Dr. Loyke ..........................................9

    Doe's appeal .....................................................................................................................10

Standard of Review..................................................................................................................11

Argument:    A preliminary injunction is warranted requiring LMU to readmit Doe pending a trial
on the merits ...........................................................................................................12

        1.    Without an injunction, Doe will suffer irreparable harm .....................................12

        2.    Doe is substantially likely to succeed on the merits of his claims........................15

                a.    Doe is substantially likely to succeed on the merits of his Title IX
claim ........................................................................................................15

                b.    Doe is substantially likely to succeed on the merits of his breach
of contract claim .....................................................................................19

                c.    Doe is substantially likely to succeed on the merits of his
negligence claim .....................................................................................22

        3.    Neither LMU nor any third party will be harmed by the granting of a
preliminary injunction. .........................................................................................24

i

    4.    The public interest will be served by granting a preliminary injunction ..............24

    5.    No bond is needed here...........................................................................................24

Conclusion ............................................................................................................................25

# INTRODUCTION

After four years of study and $350,000 in tuition and related costs, John Doe, a medical student and native of rural Appalachia, was dismissed by Lincoln Memorial University (LMU) from medical school—just four months before graduation—based on an allegation of sexual harassment that was anonymous. Doe was never told what he was supposed to have said. Nor did he have an opportunity to question the complainant, who did not appear at the hearing. Although Doe denied engaging in any harassment, an LMU administrator told Doe that a woman would not "make up" an allegation of harassment, and compared Doe's denials to assertions of innocence by a "rapist" attacking the credibility of his victim. In relying on the anonymous complaint here, LMU violated Title IX and materially breached the terms of its own Student Handbook.

Without a preliminary injunction requiring his reinstatement pending the outcome of this litigation, Doe will be deprived of the opportunity to pursue his chosen profession, he will lose the window to apply to residency programs, and he will incur reputational harm arising out of an defective hearing. A preliminary injunction should be granted (a) prohibiting LMU from enforcing its decision to dismiss Doe, and (b) requiring LMU to provide him the opportunity to finish his medical studies and graduate as a Doctor of Osteopathic Medicine.

## FACTUAL BACKGROUND[1]

### Doe's background

Doe grew up Lee County, VA, one of the poorest counties in Virginia, attended underperforming public schools, and overcame substantial financial hardship to pursue his medical education. Ver. Compl. ¶ 9. Doe is the first in his family to pursue any education past high school,

---

[1] These facts are drawn from Doe's Verified Complaint. The LMU-DCOM Handbook is Exhibit 1 to the Verified Complaint.

1

let alone professional school. *Id.* ¶ 10. Doe's parents divorced when Doe was in the third grade, and his father left to start a different family. Doe lived with his mom after the divorce, and, when she later remarried, he had a good relationship with his stepfather. Doe had little contact with his father. *Id.* ¶ 11.

Although Doe's stepfather genuinely cared for Doe and his siblings, both his stepdad and his mom abused drugs and alcohol, and they were never able to provide much for the family. *Id.* ¶ 12. Doe's mother would take her kids with her to buy cocaine, and as a child Doe watched her shoot up numerous times. *Id.* ¶ 12. Doe and his siblings were stigmatized in school as poor kids who would never amount to anything. *Id.* ¶ 13. In high school, Doe's academic performance was mediocre at best, although he did compete in sports. *Id.* Some of Doe's teachers told him to his face that he was a failure. *Id.* During Doe's junior year, the family's situation worsened when his stepdad was murdered by his own brother. Doe's mother could not cope with the loss. *Id.* ¶ 14. Her drug use increased, and she moved out to live with a boyfriend, leaving her four children to take care of themselves. *Id.*

When Doe was a senior, he was almost killed in a car accident. He was thrown from the back of a truck, and his injuries required plates and screws in his face. He managed to graduate from high school in 2002, with no plans for college, and started working in a factory. *Id.* ¶ 15.

Thereafter, Doe was introduced to a community leader in Tazewell, Tennessee, who saw promise in Doe and encouraged him to go to college. In 2006, Doe began attending Walters State Community College. After graduating from Walters State, he attended and ultimately graduated from ETSU. *Id.* ¶ 16. While at Walters State, Doe learned about Remote Area Medical (RAM), an organization that provides much-needed medical services to extremely poor areas of rural

2

Appalachia.[2] Doe started volunteering at RAM clinics, something he has continued to do ever since. In part because of his experience with RAM, Doe decided to pursue medicine, with the aim of becoming a family doctor. *Id.* ¶¶ 17-18.

**Doe's acceptance by LMU-DCOM**

LMU is a corporation engaged in the education of students in multiple disciplines including, but not limited to, the study of medicine. As the LMU-DCOM Handbook states, although the school serves students throughout the state, nation, and other countries, it "retains a commitment to enrich the lives of people in communities of the Appalachian region." Handbook at 6. LMU-DCOM is focused on enhancing "access to comprehensive health care of underserved communities." Handbook at 7-8.

Because he grew up in an "underserved" community in Appalachia, and he is committed to working in and for those communities Doe is uniquely positioned to fulfill LMU-DCOM's mission. Ver. Compl. ¶ 22. Recognizing Doe's connection to Appalachia and desire to serve the region, LMU offered Doe a position as a medical student at DCOM. He started there in the summer of 2015. *Id.* ¶ 23-24.

**Relevant provisions of the DCOM Handbook**

The body at LMU-DCOM that reviews and adjudicates conduct issues is called the Student Progress Committee or SPC. SPC's purpose "is to ensure that every graduate of LMU-DCOM has the skills, knowledge, and judgment to assume the responsibilities of an osteopathic doctor." Handbook at 61. The SPC is appointed by the Dean of LMU-DCOM and is composed of faculty members and the Dean of Students (a non-voting, ex-officio member). *Id.* The Dean of LMU-

---

[2] *See* https://www.ramusa.org/.

3

DCOM makes the final decision to uphold or reverse the recommendations of SPC. Handbook at 63.

Under the Handbook, before the SPC holds a hearing on a charge of misconduct, the student charged "will be given a summary of the allegations and the names of the complainant and witnesses." Handbook at 101. Also, "[a]t least three days prior to the start of the [SPC] meeting, the student will be shown any written documentation pertaining to the case." Handbook at 102. After the student has been afforded the opportunity to review any written documentation pertaining to the case, and after evidence is presented to the SPC, the Handbook provides that the student accused of misconduct shall have an opportunity "to present his or her version of the events in question to the committee." Handbook 102. Under the Handbook, "[t]he level of proof for a [SPC] decision shall be substantial evidence." Handbook at 101.

As the reference to "evidence" indicates, SPC's deliberations are supposed to occur only after "the presentation of the evidence." Handbook at 102. Under the rules, part of that evidence includes statements from "[t]he complainant and any witnesses." *Id.* For this phase of the hearing, although respondent is not present, SPC may ask the complainant questions. *Id.* During deliberations on whether there is "substantial evidence" that misconduct has occurred, SPC is not to consider "[a]ny previous disciplinary problems." Handbook at 102. "[A]ny prior disciplinary problems will be provided to the committee" only after it has found misconduct and the hearing "move[s] into the penalty phase." *Id.*

**Doe's performance at DCOM**

Doe overcame early academic struggles to pass all his classes at LMU, pass both of his Board Exams the first attempt, and otherwise complete all academic obligations prior to January 6, 2020. Ver. Compl. ¶ 31-32. Doe performed well in his clinical rotations. Of the 15 rotations he

4

completed, Doe received one B and 14 As. For each rotation, the clinical teacher or "preceptor" ranked each student's performance in various categories, including teamwork, ethics, and professionalism. Doe was never ranked "inadequate" in any category in any of his rotations, and most of his rankings were "excellent." *Id.* ¶ 34.

Despite the demands of the medical school curriculum, Doe continued to serve at RAM clinics. His connection with RAM was widely recognized. Last year, when DCOM was applying for a distinguished chapter award from the Gold Humanism Honor Society, Rick Slaven, LMU-DCOM's Coordinator of Student Advancement, asked Doe to reach out to RAM about writing a letter of support for DCOM. DCOM's application was successful, and it was the first school of osteopathic medicine to receive the award. *Id.* ¶ 33.

By January 2020, Doe had completed all requirements needed to graduate except six clinical rotations, and he had begun applying for a residency. *Id.* ¶ 35. After Doe applied, he received 16 different interviews for residency programs, including programs in New York, Mississippi, and Iowa. *Id.* ¶ 36. LMU-DCOM's Director of Career Services told Doe that there was a "100% chance" that he would match. *Id.*

**The anonymous complaint**

In December 2019, Doe started a rural outpatient rotation with the University of Kentucky residency program at Hazard Appalachian Regional Hospital. On December 20, 2019, Doe was told by a doctor in the program that a complaint had been made against him and that he was being taken off the rotation. Doe was not told anything about the nature of the complaint or who made it. *Id.* ¶ 40. Doe contacted Dr. Loyke, LMU-DCOM's Associate Dean of Clinical Affairs, on the same day he received the news from the hospital. Dr. Loyke told Doe to wait for the results of the hospital's internal investigation and not to go into work. Doe contacted the hospital's HR and

Risk Management departments to try to get more information, but he was informed that the hospital was not investigating the complaint. *Id.* ¶¶ 41-42.

On December 23, 2019, Doe informed Dr. Loyke that the hospital was not conducting an internal investigation of the complaint. Dr. Loyke scolded Doe for inquiring with the hospital. During this conversation, Dr. Loyke indicated that the complaint had to do with an allegation of some sort of sexual harassment or inappropriate flirtation. When Doe denied engaging in any such conduct, Dr. Loyke said that he did not believe that a woman would "make up" an allegation of harassment, and he compared Doe's asserting his innocence to a "murderer" or "rapist" attacking the credibility of his accuser even when he is "guilty." *Id.* ¶ 43.

On January 2, 2020, Doe received an email from Ms. Robin Mace, LMU-DCOM's Associate Director of Admissions. *Id.* ¶ 44. The email stated that Doe was required to present to the SPC on Monday, January 6, 2020 at 9:00 a.m. to address complaints "of unprofessional behavior in violation of the LMU-DCOM policy." The email further stated that:

> [t]he most recent complaint involves inappropriate/sexual and 'flirty' comments made to nursing staff during your most recent rotation. This is very similar to complaints made against you approximately five months ago. This complaint is one of a number of complaints regarding your behavior and it is most alarming. . . . You were also before the SPC in August of 2019 for unprofessional behavior that resulted in a letter of reprimand.

*Id.* ¶ 45.

**The prior complaints referenced in Ms. Mace's email**

The reference, in Ms. Mace's email, to "complaints" made "five months ago" was a reference to a complaint investigated by LMU's Title IX Office in the summer of 2019. *Id.* ¶ 48. In July 2019, an employee at a hospital where Doe completed a rotation alleged that, in January or February 2019, Doe bumped into her or touched her intentionally in a manner she alleged was sexual. Doe denied having had any contact with her and provided the investigator with information

6

about his schedule in the relevant period, which indicated it was unlikely he would have been on the floor where the employee worked. And the preceptor for the rotation told the investigator that, during the rotation, most of Doe's time was with the preceptor, and Doe had no relationship with the complainant. *Id.* ¶ 50. The complainant declined to be interviewed. *Id.* The investigator determined that "the preponderance of the evidence indicates that respondent **DID NOT** violate the LMU policy," and the investigation was closed. *Id.* ¶ 51.

Despite the investigator's determination, Dr. Loyke told Doe before the SPC hearing that he did not believe the findings of the Title IX investigation, even though Dr. Loyke apparently had not reviewed the investigator's report. *Id.* ¶ 52. Dr. Loyke told Doe that "no one," in reference to the female complainant in the summer 2019 Title IX investigation, "would just make up stuff like that." *Id.*

The January 2, 2020 email from Ms. Mace also referred to a "letter of reprimand" after an SPC meeting in August 2019. The August 2019 SPC meeting concerned an allegation by a nurse practitioner that, during Doe's behavioral health rotation, he did not show up for work on several occasions and that, on other occasions, he arrived in "regular clothes" to talk to staff members. *Id.* ¶ 55. The preceptor for this rotation thought that this allegation was baseless and offered to speak to SPC about it. Indeed, this preceptor gave Doe an A and, in his evaluation, described him as "diligent." *Id.*

After the August meeting, Doe received a letter summarizing SPC's decision as follows: "The SPC recommended no action be taken regarding this matter except to send you this letter to remind you of the importance of communication and professional behavior." The letter did not say that Doe was being "reprimanded," nor did it indicate that Doe had acted unprofessionally. *Id.* ¶ 56.

**The January 6, 2020 SPC hearing**

The email from Ms. Mace did not provide any information about the allegation of "flirty" comments during Doe's December 2019 rotation, such as what Doe supposedly said or when and where he supposedly said it. Nor did Ms. Mace's email identify the complainant. *Id.* ¶ 57.

Doe appeared before SPC on January 6, 2020. On that day, SPC was composed of eleven LMU-DCOM faculty members. Dr. Loyke served as an ex-officio member. *Id.* ¶ 58. Although SPC appeared to have a folder of documents concerning the allegation, Doe was not told anything about the allegation beyond the limited information in Ms. Mace's email. The complainant was not present for any portion of Doe's SPC hearing, and apparently never addressed SPC.

Doe denied engaging in any improper conduct. *Id.* ¶ 62. He asked SPC to provide him examples of the supposedly inappropriate comments he was alleged to have made. SPC did not do so. He also told the Committee that if SPC thought that he was making comments that were being misconstrued, he was willing to receive professionalism training in Harrogate. Doe emphasized that he would not have knowingly done anything to jeopardize what he had worked for ten years to achieve, especially since he was only a few months from graduation. Doe also discussed with SPC the positive evaluations he had received for all his clinical rotations. *Id.* ¶ 63.

From the outset of the meeting, SPC appeared to have already decided that Doe had made whatever comments had been alleged. It never told him, however, what the alleged comments were. *Id.* ¶ 64. SPC told Doe that the committee already knew the reason Doe was being pulled off the rotation and asked "what he wanted them to hear." No member of SPC asked Doe any further clarifying questions during the meeting. SPC appeared to believe that Doe had already been told what he was supposed to have said and who the complainant was. In any event, SPC never discussed the specific allegations with Doe. The hearing lasted no more than 15 minutes.

8

After Doe left the room, a member of SPC immediately moved to dismiss Doe from LMU-DCOM, and the motion carried. *Id.* ¶¶ 65-68.

**The January 6, 2020 meeting with Dr. Kessler and Dr. Loyke**

That same morning, Doe was summoned to a meeting with Dr. Kessler, Dean of LMU-DCOM. Dr. Loyke was also present. *Id.* ¶ 69. Dr. Kessler told Doe that SPC had recommended dismissal, and he was going to uphold the recommendation. Dr. Loyke, explaining SPC's recommendation and Dr. Kessler's decision, stated that he had no doubt about the truth of the anonymous allegation in December 2019 because it fit what Dr. Loyke and Dr. Kessler saw as a pattern of behavior. As evidence of the supposed pattern, Dr. Loyke again noted the allegation from last summer, which LMU's own Title IX investigator had investigated and found Doe not responsible for any violation of LMU policy. *Id.* ¶ 72. Neither the complainant from the summer nor the anonymous complainant in December had ever appeared before SPC, much less been cross-examined. Dr. Loyke stated, however, that he "does not have to see it snow to know, when he looks out at his car in the morning, that it did." *Id.* ¶ 73.

When Doe asked for information about the current complaint, it became apparent that Dr. Kessler and Dr. Loyke believed that Doe had already been provided with the specific allegations. That was inaccurate, and Doe tried to explain to both Dr. Kessler and Dr. Loyke that he still did not know what he was alleged to have said or who made the complaint. *Id.* ¶ 74.

Dr. Kessler then read from a document that Doe had never seen before. *Id.* ¶ 75. The document recounted allegations from a nurse that had been made anonymously. Hearing Dr. Kessler read the document was the first time Doe was told what he was supposed to have said. The document did not identify the complainant. *Id.*

9

Unbeknownst to Doe at the time, the document was based on a January 3, 2020 telephone conversation that Dr. Loyke had with the person who made the anonymous complaint. During this telephone conversation Dr. Loyke did not obtain the complainant's identity. Dr. Loyke purportedly wrote down the complainant's assertions and appears to have provided them to SPC (although not to Doe). *Id.* ¶ 76.

Doe told Dr. Kessler and Dr. Loyke unequivocally that the anonymous allegations were false and urged them to investigate. *Id.* ¶¶ 77-78. Dr. Kessler acknowledged that he did not know whether the allegations were true. Regardless, he had determined that, since the allegations appeared consistent with the allegation from last year, he was going to uphold the dismissal recommendation. *Id.* ¶ 78. Dr. Kessler did not address why SPC's recommendation was entitled to stand when Doe had not been told what the alleged comments even were until after the hearing. Nor did Dr. Kessler address how dismissal could ever be based on an allegation that was anonymous. *Id.* ¶ 79.

**Doe's appeal**

Doe appealed by letter to the Appeal Board dated January 9, 2020, identifying procedural violations with the SPC hearing. The appeal also pointed out that, when Doe asked Dr. Kessler to explain why he was being dismissed, Dr. Kessler "began reading from a document" that was "not the email" from Ms. Mace and that included allegations that were not in Ms. Mace's email. On January 14, 2020, the Appeal Board affirmed the dismissal decision of SPC and Dr. Kessler, without specifically addressing any of the grounds raised in Doe's appeal. *Id.* ¶ 84.

After four years of study and $350,000 spent in tuition and related costs, Doe was dismissed just four months before graduation. *Id.* ¶¶ 38, 85. Doe must be enrolled as a medical student prior to September 15, 2020, to match with a residency program. *Id.* ¶ 37.

## STANDARD OF REVIEW

A preliminary injunction preserves "the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A court must consider four factors in determining whether to grant a preliminary injunction: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). While "[t]hese four factors guide the discretion of the court," no single factor is dispositive. *Doe v. Harlan County Sch. Dist.*, 96 F. Supp. 2d 667, 671 (E.D. Ky. 2000) (citing *Reno*, 154 F.3d at 288). The preliminary injunction factors are considerations to be balanced, and not prerequisites that must be satisfied. *McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (quoting *Sandison v. Michigan High Sch. Ath. Ass'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)).

Given the profound ramifications of a university disciplinary sanction, courts within the Sixth Circuit have enjoined universities from imposing disciplinary sanctions until the conclusion of litigation challenging those sanctions. *See, e.g.*, *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880, at *40 (S.D. Ohio Aug. 25, 2017). Furthermore, where a student has been dismissed, courts within the Sixth Circuit have required the university to reinstate the plaintiff as a student pending the conclusion of litigation. *See, e.g.*, *Doe v. Baum*, No. 16-13174, 2019 U.S. Dist. LEXIS 169625, at *51 (E.D. Mich. Sept. 30, 2019).

11

## ARGUMENT

**A preliminary injunction is warranted requiring LMU to readmit Doe pending a trial on the merits.**

A preliminary injunction will prevent irreparable harm to Doe by enabling him to finish medical school, graduate as a Doctor of Osteopathic Medicine, and match with a residency program.

**1.      Without an injunction, Doe will suffer irreparable harm.**

Without a preliminary injunction, Doe will be deprived of the opportunity to pursue his chosen profession, lose the window to apply to residency programs, and incur reputational harm arising out of a defective hearing.

In determining whether to grant a preliminary injunction, a court will assess whether "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To be "irreparable" the harm or injury must be "actual and imminent" and not "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Irreparable injury arises where the "nature of the plaintiff's loss would make damages difficult to calculate," or where monetary damages alone will not make the plaintiff whole.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992).  *See Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 735 F. Supp. 753, 759 (M.D. Tenn. 1990) ("There is no adequate remedy at law in this case should the injunction be denied and the plaintiff ultimately prevail. . . .  Money damages simply cannot make up for the lost chance to play with one's classmates and experience the thrill and excitement of competitive sports.").

In the university discipline context, the Sixth Circuit has found that a one-year suspension and reputational harm constitute irreparable injury.  *Univ. of Cincinnati*, 872 F.3d at 407.  The Southern District of Ohio found a sufficient showing of irreparable injury where a plaintiff's "lack

12

of enrollment" would have "prevent[ed] him from applying for competitive internships necessary to advance" in his given career field. *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880, at *40 (S.D. Ohio Aug. 25, 2017).

In a case similar to Doe's, also involving a medical student facing the risk of being "unable to practice his chosen profession of medicine," the Southern District of Ohio found that the plaintiff had met his burden of demonstrating irreparable injury. *See Berger v. Nat'l Bd. of Med. Examiners*, No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666, at *78-85 (S.D. Ohio Aug. 27, 2019). The plaintiff sued after the National Board of Medical Examiners denied his request for ADA accommodations on his United States Medical Licensing Examination (USMLE) Step 2 exam. *Id.* at *1-52 (detailing the facts of the case). The court based its holding on the risk of dismissal from medical school, the loss of time and resources incurred in preparation for the Step 2 exam, the halting of continued medical training, and the delay in matching with a residency program. *Id.* at *82-87.

Here, without a preliminary injunction, Doe will lose the opportunity to finish medical school and graduate as a Doctor of Osteopathic Medicine. By the Handbook's terms, Doe must complete all coursework within six years of beginning his studies. *See* Handbook at 33-34. Since Doe began medical school in the summer of 2015, he will run out of time, absent issuance of a preliminary injunction, in this upcoming academic year.

Like the plaintiff in *Berger*, Doe will also be "unable to practice his chosen profession" until he is reinstated and allowed to graduate from LMU. *Berger*, 2019 U.S. Dist. LEXIS 145666, at *85. As the Berger court noted, "'[t]he lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation.'" *Id.* (quoting *Bonnette v. District of Columbia Court of Appeals*, 796 F. Supp. 2d 164, 186 (D. D.C. 2011)). *Berger*'s reasoning applies here. Doe's

13

irreparable injury would result not only from the forfeiture of over $350,000 in tuition and related expenses, but from the deprivation of achieving his dream of becoming a physician and having any chance of paying back his student debt. *See id.*; *Enyart v. Nat'l Conf. of Bar Examiners*, 630 F.3d 1153, 1166 (9th Cir. 2011) (affirming a finding of irreparable harm based on the plaintiff's inability to practice law without successfully passing the bar examination); *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (medical student diagnosed with anxiety disorders who completed significant amount of schooling likely to suffer irreparable harm by inability to participate in clinical rotations and earn medical degree during the pendency of the litigation).

Additionally, Doe cannot match with a residency program absent the issuance of a preliminary injunction. *See Berger*, 2019 U.S. Dist. LEXIS 145666, at *86. To begin a residency program in July 2021, Doe must be reenrolled at LMU before September 15, 2020. Ver. Compl. ¶ 37. Without a preliminary injunction, Doe will forfeit an entire match cycle, which will certainly diminish, if not erase, what the LMU-DCOM Director of Career Services referred to as Doe's "100% chance" of matching. *See Bonnette*, 796 F. Supp. 2d at 187 (noting the incalculable damage plaintiff would suffer in losing all of her preparation for the Multistate Bar Exam). In addition to the incalculable loss arising out of a diminished match prospect, Doe will suffer delay "in moving forward with a residency program," which constitutes irreparable harm because it precludes Doe "from advancing his professional career and pursuing his chosen profession in medicine." *Berger*, 2019 U.S. Dist. LEXIS 145666, at *87.

Finally, without a preliminary injunction, Doe will also suffer "reputational harm both on and off campus based on a finding rendered after an unfair hearing." *Univ. of Cincinnati*, 872 F.3d at 407. Dismissal for sexual harassment will have an un-erasable impact on Doe's professional

14

trajectory. *See Baum*, 903 F.3d at 582 (citing *Miami Univ.*, 882 F.3d at 600). This impact will be particularly pronounced for Doe because of the necessity of matching with a medical residency program. The longer LMU's dismissal of Doe is left uncorrected, the greater the chance that residency programs will become aware of the situation through word of mouth between residents or statements from LMU professors. Given the discretion that residency programs have in deciding which applicants to accept, injury to Doe's reputation will reduce his chances of matching even if he prevails on the merits of his case. *See Baum*, 903 F.3d at 582 (noting how the reputational injury of being labeled a sex offender by a university, let alone a professional school, could lead to loss of educational and employment opportunities).

All these harms are the types of "certain and immediate" harms sufficient to constitute irreparable injury and merit issuance of a preliminary injunction. *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (citing *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

**2.  Doe is substantially likely to succeed on the merits of his claims.**

**a.  Doe is substantially likely to succeed on the merits of his Title IX claim.**

Title IX states, in pertinent part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance . . . ." *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citing 20 U.S.C. § 681(a) (2020)). Title IX is enforceable through a judicially implied right of action that is actionable against any university receiving federal financial assistance. *Id.*; *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001). A Title IX plaintiff may recover where gender bias caused a university to erroneously find the plaintiff guilty of wrongdoing. *Doe v. Miami Univ.*, 247 F. Supp. 3d 875, 886 (S.D. Ohio 2017). The plaintiff

15

must plead both "facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and "a particularized . . . causal connection between the flawed outcome and gender bias." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

Doe is substantially likely to succeed on the merits of his Title IX claim against LMU, a private university receiving federal financial assistance, because Doe's erroneous dismissal resulted from a gender-biased decision to credit a female non-student's uninvestigated anonymous complaint of sexual harassment over the in-person denial of a male medical student and a hearing that was marked by significant procedural irregularities.

The plaintiff does not bear a heavy burden in proving the first element of a Title IX erroneous outcome claim. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679 (M.D. Tenn. 2018) (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)). Facts indicating "articulable doubt [as to] the accuracy of the outcome of the disciplinary proceeding" include: the absence of confrontation, lack of effective cross-examination, inadequate notice of the content of the allegations, insufficient time to meaningfully prepare for a hearing, and inconsistent factual findings by the decision maker. *See, e.g.*, *Miami Univ.*, 882 F.3d at 592-93; *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400-04 (6th Cir. 2017); *Cummins*, 662 F. App'x 446-51.

The facts of Doe's SPC hearing cast more than "some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Cummins*, 662 F. App'x at 452. SPC's failure to inform Doe of the content of the alleged statement during the hearing deprived Doe of the opportunity to contest whether he made the statement at all. Furthermore, the absence of effective notice of the content of the anonymous accusation prior to the hearing inhibited Doe from preparing for the hearing. Additionally, Doe was afforded no opportunity to confront, cross-examine, or even know the identity of his accuser. Therefore, Doe's hearing failed to achieve even

16

"basic fairness." *See id.* at 446 (internal citations omitted) (explaining that, in order to provide basic fairness, a disciplinary proceeding must afford a student "a meaningful opportunity to present his side" and "respond, explain, and defend" against any accusation). Given that the Sixth Circuit has found mere "unexplained discrepancies" in a disciplinary tribunal's factual findings sufficient to meet the first element of a Title IX erroneous outcome claim, a proceeding lacking even the elements of basic fairness demonstrates a substantial likelihood of success on the merits. *Miami Univ.*, 882 F.3d at 592-93. *See Reno*, 154 F.3d at 288.

A Title IX erroneous outcome plaintiff must also show "a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715). "Such allegations [may include] statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. Furthermore, a plaintiff may demonstrate causal connection through pointing to the application of disparate standards of evaluation between female testimony and male testimony. *See Doe v. Baum*, 903 F.3d 575, 586-87 (6th Cir. 2018).

That LMU clearly deviated from its own procedures "permit[s] a plausible inference of sex discrimination." *Doe v. Oberlin Coll.*, No. 19-3342, 2020 U.S. App. LEXIS 20226, at *17-19 (6th Cir. June 29, 2020). Also, LMU's inexplicable willingness to credit an anonymous complaint by a non-student over a male student's adamant denial is precisely what *Baum* identified as evidencing plausible gender-bias. *See Baum*, 903 F.3d at 586 (noting the inference of gender bias arising, in part, out of the defendant university crediting exclusively female testimony and discrediting exclusively male testimony). Here, as in *Baum*, LMU credited both the July and December 2019 complaints, both made by females, without any veracity inquiry. *Id.* LMU

17

discredited the findings of Travis Smith, Doe himself, and the affirmative evidence presented by the preceptor in Doe's July 2019 Behavioral Health Rotation. Importantly, LMU presented no basis for why it discredited all evidence from Doe, Mr. Smith, and Doe's preceptor, all males, regarding the July 2019 complaint. *See id.* (noting evidence of a double standard where the defendant university discounted the credibility of testimony from the plaintiff's fraternity brothers because they were fraternity brothers, but "did not similarly note that several of Roe's witnesses were her sorority sisters. . . .").

Furthermore, Dr. Loyke, an ex-officio member of SPC present during both the SPC hearing and Dr. Kessler's dismissal meeting with Doe, compared Doe's denial to a murderer or rapist professing his innocence and emphasized that female accusers do not "just make these things up." Given Dr. Loyke's role, his statement indicates that SPC and LMU applied a gender-based double standard of veracity inquiry. *See Miami Univ.*, 882 F.3d at 593. For Doe, a male medical student, an adamant denial was not enough even to prompt an investigation of the anonymous allegation. For the female non-student complainant, an anonymous complaint was enough to render Doe responsible for sexual harassment without further inquiry. Doe has a substantial likelihood of success on the merits of his Title IX claim. *See Reno*, 154 F.3d at 288.

Doe was erroneously dismissed in violation of 20 U.S.C. 1681(a) and in the absence of basic fairness. Dr. Kessler's decision to uphold the SPC determination was caused by LMU's willingness to credit anonymous allegations made by a female, against Doe, without allowing Doe an opportunity to defend himself. *See Baum*, 903 F.3d at 586. Therefore, Doe is substantially likely to succeed on the merits of his Title IX claim. *See Reno*, 154 F.3d at 288.

18

**b. Doe is substantially likely to succeed on the merits of his breach of contract claim.**

The Tennessee Court of Appeals recently reaffirmed that a student at a private school has a valid breach of contract claim when the school violates its own handbook. *See Rice v. Belmont Univ.*, No. M2018-01092-COA-R3-CV, 2020 Tenn. App. LEXIS 253 (Tenn. Ct. App. May 29, 2020). Doe is asserting a breach of contract claim arising from LMU's decision to dismiss him based on an anonymous complaint of sexual harassment and other related material breaches of the Handbook by LMU. *Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011). *See also Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) (explaining that provisions of university's student handbook may be enforced in Tennessee as an implied contract). The policies and procedures set out in the university handbook define the implied contractual relationship between the student and the university. *See id.*; *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 689 (M.D. Tenn. 2018). A federal court will apply the law of the state where the alleged breach of contract occurred in assessing the claim. *See Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015).

To allege a breach of contract claim in Tennessee, a plaintiff must plead (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breach. *Life Care Ctrs. of America, Inc. v. Charles Town Assocs. Ltd. Partnership, LPIMC, Inc.*, 79 F.3d 496, 514 (6th Cir. 1996) (applying Tennessee law). In the university disciplinary proceeding context, a court will afford deference to a university accused of breach of contract based on the "academic judgment" to dismiss a student. *Al-Dabagh*, 777 F.3d at 359. "Academic judgments" may include more than grades and other objective performance indicators. *Id.* (citing *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549-50 (6th Cir. 2013); *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003)). Breaches of contract during disciplinary

19

proceedings, however, receive far less deference. *See Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 297 (6th Cir. 2019) (internal citations omitted) ("The Supreme Court has recognized a critical distinction between dismissals for disciplinary misconduct and dismissals for academic underperformance."); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 577 (6th Cir. 1988).

In addition to its explicit terms, every Tennessee contract contains an implied duty of good faith and fair dealing. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013). In university disciplinary proceedings, the implied covenant of good faith and fair dealing creates a duty to provide "basic fairness." *Z.J.*, 355 F. Supp. at 699. In assessing whether the implied obligation to provide "basic fairness" was met, a court will determine whether a university provided the accused student with meaningful notice and an opportunity to be heard. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 601 (D. Mass. 2016). Refusing to provide a student "with the specific factual conduct alleged to have given rise to the charge," as LMU did here, makes it "impossible for the student to defend himself." *See Faparusi v. Case W. Reserve Univ.*, 711 Fed. Appx 269, 274 (6th Cir. 2017) (quoting *Brandeis*, 177 F. Supp. 3d at 604). *See also Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015).

LMU materially breached the Handbook in multiple ways, including the following:

1. LMU failed to provide Doe with "a summary of the allegations and the names of the complainant and witnesses." Handbook at 101.

2. LMU did not provide Doe with any written documentation pertaining to the case, let alone provide that documentation "[a]t least three days prior to the start of the [SPC] meeting, . . ." Handbook at 102.

20

3. LMU afforded Doe no opportunity to "to present his . . . version of the events in question to [SPC]" besides asking him to "explain himself" without offering him any facts regarding the actual statements he was accused of making. *See* Handbook 102.

4. Under the Handbook, "[t]he level of proof for a [SPC] decision shall be substantial evidence," but SPC recommended dismissal based solely on an unverified anonymous complaint without explaining how this complaint could amount to "substantial evidence." *See* Handbook at 101.

5. As the Handbook's reference to "evidence" indicates, SPC's deliberations are supposed to occur only after "the presentation of the evidence," and part of that evidence includes statements from "[t]he complainant and any witnesses." Handbook at 102. However, on information and belief, the complainant never testified before SPC.

6. SPC breached the terms of the Handbook by considering Doe's prior accusations prior to the penalty stage. *See* Handbook at 102 (providing that SPC is not to consider "[a]ny previous disciplinary problems" during the investigatory and adjudicatory phases of the disciplinary process). As the Handbook clearly states, "any prior disciplinary problems will be provided to the committee" only after it has found the student responsible and the hearing "move[s] into the penalty phase." Handbook at 102.

These breaches of the Handbook fail the "objective reasonableness" test. *Faparusi*, 711 Fed. Appx. at 277. Unlike *Faparusi*, Doe was not afforded with "the evidence to be used against

him at the hearing." *Id.* In fact, Doe had no idea what he was alleged to have said until Dr. Kessler read the statement to him after SPC had already recommended dismissal.

Finally, LMU's failure to provide "basic fairness" to Doe amounted to a breach of the implied covenant of good-faith and fair dealing that is implied in all Tennessee contracts. *See Z.J.*, 355 F. Supp. at 699; *Dick Broad. Co., Inc. of Tenn.*, 395 S.W.3d at 660. LMU failed to afford Doe any notice of the substance of the allegations against him or a meaningful opportunity to respond. Therefore, LMU's conduct amounted to a breach of the implied covenant of good-faith and fair dealing in addition to a breach of the Handbook's express terms.

### c. Doe is substantially likely to succeed on the merits of his negligence claim.

To state a negligence claim in Tennessee, a plaintiff must establish: "1) a duty of care owed by the defendant to the plaintiff; 2) a breach of that duty; 3) an injury or loss; 4) cause in fact; and 5) proximate legal causation." *Atria*, 142 F. App'x at 251 (citing *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996)). Under Tennessee law, "'all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. . . .'" *Id.* (quoting *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003)). Therefore, LMU owes everyone, including Doe, "a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm." *Id.*; *Burroughs v. Magee*, 118 S.W.3d 323, 329 (Tenn. 2003).

Conduct creates an unreasonable and foreseeable risk of harm where "the foreseeable probability and gravity of harm posed by [the] defendant's conduct outweigh the burden upon [the] defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 995). To establish proximate cause a plaintiff must prove:

> 1) the tortfeasor's conduct [was] a 'substantial factor' in bringing about the harm being complained of; 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and

3) the harm giving rise to the action could reasonably have been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Haynes v. Hamilton County*, 883 S.W.2d 606, 611-12 (Tenn. 1994) (quoting *McClenahan*, 806 S.W.2d at 775).

Here, LMU's failure to investigate the December 2019 anonymous complaint against Doe was the cause in fact and proximate legal cause of Doe's wrongful dismissal for sexual harassment and resulting damages.

LMU owed Doe a duty to investigate the anonymous complaint of sexual harassment against Doe because the failure to investigate this serious allegation created an unjustifiable risk that Doe could be wrongfully adjudicated of sexual harassment. *See Atria*, 142 F. App'x at 252 ("[a] jury reasonably could conclude that Professor Hess's distribution system created an unreasonable risk of harm because the foreseeable probability of, and the gravity of the harm resulting from, a wrongful Honor Council conviction outweigh the burden on Professor Hess to redistribute the photocopy of the answer sheet rather than the original."). The gravity of harm posed by LMU's failure to investigate the anonymous complaint was severe because a wrongful sexual harassment finding could ruin a medical student's ability to gain acceptance to a residency program, become a licensed physician, and pay back his student debt. The foreseeable probability of harm is also high in Doe's case. The burden of reasonably investigating an anonymous complaint, while not *de minimis*, is not heavy. As LMU demonstrated in the summer of 2019, the university can conduct a full independent investigation in less than eight weeks. The gravity of harm significantly outweighed the burden to investigate. *See Atria*, 142 F. App'x at 252.

LMU's breach in the standard of care was the cause in fact of Plaintiff's loss. Without this breach, LMU would not have dismissed Doe. LMU's conduct was thus a "'substantial factor' in

bringing about [Doe's] damages." *Haynes*, 883 S.W.2d at 611-12 (quoting *McClenahan*, 806 S.W.2d at 775). Doe is substantially likely to succeed on the merits of his negligence claim. *See Reno*, 154 F.3d at 288.

**3.    Neither LMU nor any third party will be harmed by the granting of a preliminary injunction.**

A court must determine whether issuing a preliminary injunction would "cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550-51 (6th Cir. 2007) (internal citation omitted). Permitting Doe to finish his rotations, at his expense, will not cause LMU any harm. To the extent the anonymous complainant has a legitimate interest in not interacting with Doe, that interest comes into play only if Doe completes a rotation at that particular hospital, which is not necessary. Doe's interactions with any third parties may be quite restricted if LMU offers rotations remotely because of the pandemic. And Doe's interactions with patients have been praised by his preceptors.

**4.    The public interest will be served by granting a preliminary injunction.**

The final factor for a court to weigh is whether granting the motion for a preliminary injunction furthers the public interest. *See Tenke Corp.*, 511 F.3d at 551. In Doe's case, as in *Tenke Corp.*, the public policy of enforcing contractual obligations, is furthered by issuance of a preliminary injunction. *Id.* Furthermore, courts disfavor forfeiture "by implication or by construction." *See In re Erie L.R. Co.*, 548 F.2d 621, 627 (6th Cir. 1977). Here, without an injunction, Doe would forfeit $350,000 in tuition payments and related costs because of the reduction of his chances of graduating and practicing medicine.

24

**5.    No bond is needed here.**

Although Rule 65(c) appears to a require a bond or other security for a preliminary injunction, "the district court possesses discretion over whether to require the posting of security." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013).    Because an injunction here will not harm LMU or cause it monetary loss, Doe respectfully requests that the requirement under Rule 65(c) to post a bond be waived.    *See Elmore v. Bellarmine Univ.*, 2018 U.S. Dist. LEXIS 52564, at *22-23 (W.D. Ky. 2018) (waiving bond requirement for student seeking injunction because the university was not going to suffer any harm from the injunction).

## CONCLUSION

Doe has devoted more than a decade of his life to becoming a doctor.    Title IX, LMU's own Handbook, and fundamental fairness do not permit all that work to be nullified—one semester from graduation—based on an anonymous allegation.    A preliminary injunction should be granted that prohibits LMU from enforcing its decision to dismiss Doe, and requires LMU to provide him the opportunity to finish his medical studies, apply for a residency, and graduate as a Doctor of Osteopathic Medicine.

Respectfully submitted July 16, 2020.

RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.

s/James R. Stovall
James R. Stovall [BPR # 032512]
606 W. Main Street, Suite 300
Knoxville, TN  37902
(865) 637-0661
jstovall@rddjlaw.com

25