**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-CV-00315-DCLC |
| | ) | |
| LINCOLN MEMORIAL UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

**LINCOLN MEMORIAL UNIVERSITY'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

Defendant Lincoln Memorial University ("LMU") dismissed Plaintiff John Doe[1] ("Plaintiff") from its Debusk College of Osteopathic Medicine ("LMU-DCOM") in January 2020 following repeated complaints and instances of poor professionalism, academic deficiencies, and inappropriate behavior which he refused to correct despite being given numerous opportunities to improve and remedy these issues. It did not dismiss him based on a single, anonymous allegation of sexual harassment. Prior to his dismissal following the January 6, 2020 Student Progress Committee ("SPC") meeting, Plaintiff had been called before the SPC on four different occasions and been the subject of both a Title IX investigation and a complaint to LMU's CARE Committee. LMU, its faculty, and the SPC continuously worked with Plaintiff throughout his time as a LMU-DCOM student to provide him with the information and

---

[1] Plaintiff will be referred to as John Doe due to Plaintiff's pending Motion for Leave to Proceed Under a Pseudonym, which LMU does not oppose. Plaintiff's name has been redacted from each of the Exhibits attached hereto and replaced with "John Doe" or Mr. Doe". The information on the Exhibits related to other students has also been redacted to comply with the Family Education Rights and Privacy Act of 1974 ("FERPA").

knowledge to improve and correct his performance and behavior. LMU repeatedly warned Plaintiff that his failure to correct his behavior would lead to his dismissal, but these warnings went unheeded. When Plaintiff continued to exhibit the same unprofessional behavior during his clinical rotations that he had exhibited throughout his time in medical school, LMU-DCOM had no choice but to dismiss him.

As the following discussion illustrates, Plaintiff is not entitled to a preliminary injunction, or any injunctive relief, and his motion should be denied.

## II.  FACTS

### A.  The Student Progress Committee.

LMU-DCOM maintains a Student Handbook and Catalog ("Student Handbook") which contains various policies, procedures, guidelines and course descriptions for its medical students, including a description of the purpose and guidelines for the Student Progress Committee, commonly referred to as the SPC:

> The purpose of the [SPC] is to ensure that every graduate of LMU-DCOM has the skills, knowledge, and judgment to assume the responsibilities of any osteopathic doctor. The Committee will monitor student progress and ensure that all students meet the academic and professional requirements necessary for advancement in the curriculum and graduation. The Committee, appointed by the Dean of LMU-DCOM, is composed of faculty members and the Dean of Students (non-voting, *ex-officio* member).

(Student Handbook p. 61).[2]  The SPC Procedures for Academic Deficiencies, set forth on pages 62-64 of the Student Handbook, provide that "the Dean of Students schedules a meeting date, informs students of the meeting via LMU email, provides an agenda to the members, and convenes the meeting."  (*Id.* at p. 62).  Minutes of the meeting are kept by a recording secretary and all matters are submitted to a majority vote with the chair serving as a tie-breaker.  (*Id.*).

---

[2] A copy of the LMU-DCOM Student Handbook is attached as Exhibit 1 to Plaintiff's Verified Complaint [Doc #1].

"The student's entire academic record can be examined at an SPC meeting." (*Id.*). The SPC Procedures for Academic Deficiencies not only apply to instances of academic deficiencies, they also apply to students who receive negative comments on clinical rotations or "who have any other academic or professionalism issue." (*Id.*).

Following a meeting, the SPC will make a recommendation to the Dean of LMU-DCOM. The Dean reviews the recommendation of the SPC and will affirm, amend or reverse the recommendation within five working days of receiving it. (*Id.* at p. 63). A student can appeal the Dean's decision to the Appeals Board within five working days of receiving the Dean's decision. (*Id.*). All decisions of the Appeals Board are final. (*Id.* at 64). The Student Handbook specifically states that "**LMU-DCOM reserves the right to dismiss any medical student at any time prior to graduation.** Circumstances warranting such action may be of an academic, legal or professional nature." (*Id.*) (emphasis in original).

The Student Handbook has a separate and distinct set of disciplinary hearing procedures that apply when "a report alleging student misconduct comes to the Office of Admission and Student Services." (*Id.* at pp. 100-102). In that situation, the Dean of Students conducts an initial investigation by, among other things, taking written and/or oral statements from the complainant, respondent and any witnesses. The Dean of Students makes a determination and finding based on this investigation, which the student can then appeal to the SPC. The Student Handbook contains procedures for the SPC when hearing these appeals of misconduct that are substantially different than the procedures for deciding academic and professionalism issues. (*Id.* at pp. 62, 101-02). The SPC will make a recommendation to the Dean, who will notify the student of his or her final decision within three working days. (*Id.* at 102).

4606696.1

**B.      Plaintiff's History of Performance And Academic Issues.**

Plaintiff enrolled in the LMU-DCOM in the summer of 2015.  During his five years of medical school, he was called before the SPC on five separate occasions.  This is significant since the vast majority of LMU-DCOM's medical students never go before the SPC and it is rare for any student to make more than one or two appearances before the committee.  (Declaration of Christopher Loyke, D.O. ("Loyke Decl.") ¶ 11, attached hereto as *Exhibit 1*).  Each time Plaintiff met with the SPC it involved academic and/or professionalism issues, falling under the SPC's procedures for addressing academic and professional deficiencies set forth on pages 61-64 of the Student Handbook.  None of the situations involved the SPC acting in its role as the first level of appeal as part of disciplinary proceedings into reports of misconduct set forth on pages 101-103 of the Handbook.

Plaintiff made his first appearance before the SPC on May 24, 2016, at the end of his first year of medical school.  This meeting was the result of academic deficiencies and "several complaints of lack of professional behavior".  (A copy of the SPC's May 24, 2016 meeting minutes is attached as *Exhibit 2*).  These complaints included, but were not limited to, an incident that occurred on May 18, 2016 during which Plaintiff yelled explicatives and verbally threatened the husband of another medical student, to the point that campus police were called to the scene. (*Id*).  Several members of the SPC voiced their concerns to Plaintiff regarding his behavior and recommended steps that he needed to take to address these concerns, including one member telling Plaintiff that "this was a harsh wakeup call."  (*Id.*).      The SPC ultimately moved to have Plaintiff "placed on Academic and Professionalism Probation and be allowed to remediate" the class he failed.  (*Id.*).  On May 25, 2016, Dean Kessler notified Plaintiff that he would be placed on academic probation, allowed to remediate a course, and placed on professional probation. (*Id*.)  (A copy of the May 25, 2016 letter is attached as *Exhibit 3*).  The letter stated that "[a]ny

4

further Professionalism issues will result in reappearance before the SPC with consideration for dismissal." (*Id.*)

On October 24, 2016, Plaintiff was called before the SPC for multiple course failures. (A copy of the SPC's October 24, 2016 minutes is attached as *Exhibit 4*). The SPC recommended that Plaintiff be recessed for the remainder of the 2016-2017 academic year with the option to return to medical school in the Fall of 2017. (*Id.*). Dean Kessler accepted the recommendation of the SPC. In Dean Kessler's October 25, 2016 letter to Plaintiff notifying him of the recession, he advised Plaintiff that if he returned to LMU-DCOM he would be placed on both academic and professional probation for the duration of medical school and that "any further academic and/or professionalism issues will result in a reappearance before the SPC with the likelihood of dismissal." (A copy of the October 25, 2016 letter is attached as *Exhibit 5*).

In August of 2018, a student contacted LMU's Title IX Coordinator complaining about Plaintiff's threatening and intimidating behavior towards her, as well as her concern about his personal wellbeing. This behavior included a series of text messages in which Plaintiff threatened to send a written statement to the female student's family containing graphic details of her alleged sexual activity. (A portion of Plaintiff's text messages and the written statement are attached as *Exhibit 6*). Due to the threatening nature of the text messages, the issue was reported to LMU's CARE Committee.[3] The Committee learned that Plaintiff's behavior was not an isolated incident and had affected other individuals across the campus community. (A copy of the Care Committee's August 29, 2018 letter to Plaintiff is attached as *Exhibit 7*). Despite being on academic and professional probation, Plaintiff was not brought before the SPC for this matter.

---

[3] The Care Committee is a collaborative, interdisciplinary team of university officials who convene to assess, based on reasonable judgment, current factual information and the best available objective evidence to ascertain whether a member of the campus community may pose a direct threat to themselves or the community.

5

Rather, it was decided that Plaintiff would be counseled by the Title IX Coordinator regarding his behavior. On September 5, 2018, Plaintiff signed an acknowledgement stating that he had been counseled regarding unprofessional behavior and warned that further unprofessional conduct could result in disciplinary action and would be addressed by the SPC. (A copy of the Acknowledgement is attached as *Exhibit 8*).

On February 12, 2019, Plaintiff was called before the SPC to address the fact that he had failed multiple Comprehensive Osteopathic Medical Achievement Tests ("COMAT") as part of his clinical rotations. (A copy of the SPC's February 12, 2019 SPC meeting minutes is attached as *Exhibit 9*). The SPC provided Plaintiff an opportunity to improve his performance by assigning him a mentor, and recommended that Plaintiff continue counseling and restrict his extracurricular activities. (*Id*.). At the end of this meeting, no motion was made regarding any formal action to be taken by Plaintiff. (*Id.*).

On July 1, 2019, LMU-DCOM received a letter from Appalachian Regional Healthcare ("ARH") regarding Plaintiff's lack of professionalism during his behavioral health rotation. (A copy of the July 1, 2019 letter is attached as *Exhibit 10*). ARH is a health system of approximately thirteen hospitals located in eastern Kentucky and southern West Virginia and is one of the main health systems in which LMU-DCOM's students conduct their clinical rotations. (Loyke Dec. ¶ 6). Plaintiff was called before the SPC to discuss these concerns on July 19, 2019. The SPC's meeting minutes reflect a lengthy discussion with Plaintiff regarding his continued professionalism issues and the Committee's significant concern regarding his ability to correct this behavior and successfully work as a physician. (a copy of the July 9, 2019 meeting minutes is attached as *Exhibit 11*). Rather than make a recommendation at that time, the Committee tabled the matter to allow for additional investigation into the rotation site complaint.

6

(*Id.*).  Dr. Christoper Loyke, LMU-DCOM's Associate Dean of Clinical Affairs, reported to the SPC in its August 2, 2019 meeting that the nurse practitioner who had initially reported the issues reiterated her concerns to him during his follow-up investigation and that one of the physicians Plaintiff worked with on the rotation supported Plaintiff.  (A copy of the SPC's August 2, 2019 meeting minutes is attached as *Exhibit 12*).  Dr. Loyke recommended that Plaintiff be admonished for poor communication and lack of professional behavior, and this recommendation was approved by the SPC.  Consistent with this recommendation, Plaintiff received a letter of admonishment on August 2, 2019 reminding him again of the importance of communication and professional behavior.  (A copy of the August 2, 2019 letter is attached as *Exhibit 13*).

Meanwhile, in the latter part of July 2019, LMU-DCOM received a complaint that had been made against Plaintiff by an employee working at ARH's located Harlan, Kentucky Hospital, one of the facilities in which Plaintiff was performing a clinical rotation.  The employee provided a written statement alleging three separate incidents involving Plaintiff which had occurred in January and February 2019 in which Plaintiff allegedly: pushed himself against her from behind at the nurse's station; came up behind her, pulled her hair forcefully and stated "I bet you like your hair pulled"; and rubbed her back while saying "hey honey" and then moved his hand down her back to her behind.  (A copy of the employee's written statement is attached as *Exhibit 14*).  Plaintiff was removed from the rotation as a result of the complaint.  Because of the nature of the allegations, the complaint was submitted to LMU's Title IX Coordinator for investigation.

Plaintiff denied the allegations during the investigation.  (Confidential Final Report p. 3, attached hereto as *Exhibit 15*).  The ARH employee declined to participate in LMU's

investigation or provide any additional information beyond the initial written statement, which precluded the investigator from determining the veracity of the allegations. *Id*. As such, the investigator found that the preponderance of the evidence indicated Plaintiff did not violate LMU policy. (*Id.*). While Plaintiff could have been brought before the SPC to answer for the fact that he had yet again been the subject of a complaint, Plaintiff was not called before the SPC at that time.

On December 20, 2019, Dr. Loyke was contacted by a physician at ARH to notify him that an employee at ARH's Hazard, Kentucky Hospital had filed a complaint with ARH administration alleging Plaintiff had made inappropriate comments of a sexual nature to her. (a copy of the December 20, 2019 email to Dr. Loyke is attached as *Exhibit 16*). The physician notified Mr. Loyke that Plaintiff was being dismissed from the rotation until the situation was resolved. (*Id.*)

On the same day, Dr. Loyke spoke with Plaintiff about the complaint. (Loyke Decl. ¶ 8). Plaintiff denied any inappropriate comments or behavior during this conversation. (*Id*.) Dr. Loyke informed Plaintiff that ARH did not want him to return to his rotation while it looked into the situation. (*Id.*). Dr. Loyke specifically instructed Plaintiff not to contact ARH regarding the complaint or its investigation since, under the clinical rotation protocols, such communication was to be between ARH and LMU-DCOM. (*Id*)

On or about December 23, 2019, Dr. Loyke spoke with Plaintiff again to advise him that he would be required to appear before the SPC. (*Id*. at ¶10) Dr. Loyke also discussed with Plaintiff that the SPC would be reviewing all of the complaints of professional misconduct that had been made against Plaintiff during his time as a medical student at LMU-DCOM, including complaints that had not been previously brought before the SPC. (*Id*.). Plaintiff acknowledged

8

that he understood why he was being called before the SPC and that he could be subject to dismissal from LMU-DCOM. (*Id.*) Plaintiff told Dr. Loyke in a subsequent call that he had contacted ARH administration, even though Dr. Loyke had specifically instructed him not to do so, and had been told ARH was not going to investigate the complaint since he had already been removed from the facility. (*Id.* at ¶12). Dr. Loyke was not happy that Plaintiff had disregarded his specific directive not to contact ARH and expressed his frustrations to Plaintiff regarding his insubordinate action. (*Id.*).

Dr. Loyke subsequently talked with an administrator at ARH regarding its investigation into the complaint against Plaintiff. (*Id.* at ¶13). The administrator stated that no investigation was undertaken since Plaintiff was not employed at ARH and had been removed from the facility. (*Id.*). The administrator also advised Dr. Loyke that Plaintiff was not allowed to return to ARH. (*Id.*).

On January 3, 2020, Dr. Loyke spoke with the ARH employee who had made the complaint. (*Id.* at ¶ 14). The employee requested to remain anonymous. (*Id.*) The employee stated that Plaintiff made several inappropriate sexual remarks to her, followed her around, and invaded her personal space on numerous occasions. (*Id.*) The employee indicated that these behaviors sometimes occurred in front of patients. (*Id.*).

LMU notified Plaintiff via email on January 2, 2020 that he was required to appear before the SPC on January 6, 2020 to respond to complaints of unprofessional behavior in violation of LMU-DCOM policy. (A copy of the January 2, 2020 email is attached as *Exhibit 17*). The email made clear that the January 6, 2020 meeting was not limited to the December 23, 2019 complaint but would encompass the pattern of complaints regarding Plaintiff's lack of professionalism. (*Id.*). It also made clear that Plaintiff should be prepared to address these

issues and his behavior, and that the SPC would be considering dismissing him from the medical school. (*Id.*)

Plaintiff met with the SPC as scheduled on January 6, 2020. The SPC conducted this meeting pursuant to the Committee Procedures for Academic Deficiencies set forth on pages 62-64 of the Student Handbook to review and consider all of the complaints of professional misconduct that had been made against Plaintiff during his time as a medical student at LMU-DCOM. (January 2, 2020 email; Student Handbook pp. 62-64). The meeting was not a misconduct hearing conducted as part of the Disciplinary Procedures process set forth on pages 100-102 of the Student Handbook. (Student Handbook pp. 100-102). Following this meeting, the SPC recommended that Plaintiff be dismissed from the LMU-DCOM. (a copy of the SPC's January 6, 2020 meeting minutes is attached as *Exhibit 18*). SPC's recommendation was immediately forwarded to the Dean who requested to meet with Plaintiff as soon as possible. After reviewing the information, and in light of the fact that Plaintiff was already on academic and professional probation, Dean Kessler accepted the Committee's recommendation and notified Plaintiff of the dismissal by letter on January 7, 2020. (A copy of Dean Kessler's letter is attached as *Exhibit 19*). The letter notified Plaintiff that he was dismissed under LMU-DCOM's policy which states that students can be dismissed at any time for academic or professional issues. (*Id.*).

Plaintiff filed an appeal of the Dean's decision, and the Appeals Committee met on January 14, 2020 to review the appeal. (A copy of the Appeals Committee's letter is attached as *Exhibit 20*). After a thorough review and consideration of Plaintiff's grounds for appeal, the Committee upheld the Dean's decision and notified Plaintiff by letter on January 14, 2020 of its decision. (*Id.*).

10

### III.   ARGUMENT AND CITATION OF AUTHORITY

**A.   Plaintiff Cannot Prove He Is Entitled To A Preliminary Injunction.**

"A preliminary injunction has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Doe v. Transylvania Univ.*, 2020 WL 1860696, at *5 (E.D. Ky. April 13, 2020) (*quoting Am. Civ. Liberties Union of Ky. v. McCreary Cty., Ky.,* 354 F.3d 438, 444 (6th Cir. 2003)). While motions for preliminary injunctions are intended to "preserve the relative positions of the parties until a trial on the merits can be held", Plaintiff is not seeking to maintain the *status quo* in his present motion. *See Id.* (*quoting Univ. of Texas, et al. v. Camenisch*, 451 US 390, 395 (1981)). Instead, Plaintiff is asking the Court to issue a preliminary injunction that would reverse Plaintiff's January 7, 2020 dismissal and require LMU-DCOM to reinstate him approximately seven months after his dismissal.

To obtain a preliminary injunction, Plaintiff must prove that: he has a strong likelihood of success on the merits of his claim; he will suffer irreparable harm if the preliminary injunction is not granted; the balance of the equities tip in Plaintiff's favor; and a preliminary injunction will serve the public's interest. *See King Pharmaceuticals, Inc. v. Zymogentics, Inc.*, 2009 WL 4931238, at *4 (E.D. Tenn. Dec. 10, 2009) (denying motion for preliminary injunction).

As the following discussion illustrates, Plaintiff cannot meet this burden for multiple reasons.

**B.   Plaintiff Cannot Show A Strong Likelihood Of Success On The Merits of His Claims.**

Plaintiff's motion for preliminary injunction is based on his contention that the SPC did not consistently follow the hearing procedures for handling disciplinary complaints as set forth in its Student Handbook when it dismissed him based on one "allegation of sexual harassment that was anonymous." (Pl.'s Memorandum 1). The record evidence refutes this contention. First,

the SPC conducted the January 6, 2020 meeting pursuant to the procedures for conducting academic hearings set forth on pages 62-64 of the Student Handbook. (Student Handbook p. 62; January 2, 2020 email; SPC January 6, 2020 meeting minutes). It was not a misconduct hearing conducted as part of the Disciplinary Procedures process set forth on pages 100-102 of the Student Handbook. Second, LMU-DCOM did not dismiss Plaintiff based solely on the December 2019 complaint of inappropriate behavior. It dismissed Plaintiff following repeated complaints and instances of poor professionalism, academic deficiencies, and inappropriate behavior, which he refused to correct despite being given numerous opportunities to improve and remedy these issues. (SPC meeting minutes from May 24, 2016, October 24, 2016, February 12, 2019, July 9, 2019, and August 2, 2019; January 7, 2020 letter). These facts necessitate the denial of Plaintiff's Motion for a Preliminary Injunction since they prevent him from establishing the essential elements of his Title IX, breach of contract and negligence claims against LMU.

      1.    <u>Plaintiff Cannot Demonstrate a Likelihood of Success On The Merits Of His Title IX Claim.</u>

Plaintiff relies on the "erroneous outcome" theory to support his Title IX claim. (Pl. Memorandum pp. 16-18). To prove an erroneous outcome claim, Plaintiff must show "(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (2) a particularized … causal connection between the flawed outcome and gender bias." *See Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *7 (M.D. Tenn. Sept. 30, 2019) (*citing Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)). The first element of this two-part test can normally be met by showing "particular procedural flaws affecting the proof" relied upon by the university in making its decision. *Id.* (*citing Yusuf v. Vasser Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). The second element, which requires a significantly higher level of proof, can be met by showing a causal connection between the alleged flawed outcome and

12

gender bias through such proof as statistical evidence of gender bias in the decision-making, process, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias. *Id.* (internal citations omitted). The court's role in this process is not to retry the university's proceedings or set aside decisions which the court may view as lacking in wisdom or compassion; it is only to determine if the university discriminated against the plaintiff in violation of Title IX. *See, id.* at *6 (*citing Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461)(S.D. N.Y. 2015) (additional citations omitted).

a.    The January 6, 2020 SPC meeting was conducted pursuant to and consistent with the procedures for holding academic hearings as set forth in the Student Handbook.

Plaintiff cannot establish either element necessary to support an erroneous outcome theory of Title IX liability. As an initial matter, Plaintiff cannot create any articulable doubt regarding the accuracy of the SPC's process for recommending his dismissal following its January 6, 2020 meeting. As detailed above, LMU-DCOM did not dismiss Plaintiff as part of a disciplinary proceeding based on a single allegation involving sexual misconduct. The January 6, 2016 SPC meeting was conducted pursuant to the procedures for holding Academic Hearings to review Plaintiff's overall history of complaints and instances of poor professionalism, academic deficiencies, and inappropriate behavior. (January 2, 2020 email; Student Handbook pp. 62-64). This fact distinguishes Plaintiff's situation from the Title IX cases relied upon by him in his Memorandum. (*See* Pl.'s Memorandum p. 16-17, *citing Miami Univ., 882 F.3d at 592-93; Doe v. Cincinnati*, 872 F.3d 393, 400-4004 (6th Cir. 2017); *Cummins*, 662 F. App'x 446-51)). Each of those cases involved disciplinary hearings into complaints of sexual misconduct. *Id.* More importantly, it also negates Plaintiff's attempt to establish the first element of the erroneous outcome test by arguing that LMU-DCOM failed to adhere to the

13

procedures for investigating and conducting a hearing into a report of misconduct under the Disciplinary Procedures section of the Student Handbook. Because Plaintiff cannot show that LMU-DCOM failed to follow the applicable procedures in reaching its decision, he cannot cast any articulable doubt on the outcome of the SPC's hearing. *See, Doe v. Vanderbilt Univ,* 2019 WL 4748310, at *7.

Plaintiff's contention that he was denied the "basic elements of fairness" by the SPC during its January 6, 2020 meeting is similarly without merit. The record shows that Plaintiff had been before the SPC at least four times prior the January 6, 2020 meeting and was well-versed in its procedures and how the meeting would be conducted. (*See* SPC meeting minutes from May 24, 2016, October 24, 2016, February 2, 206 and July 9, 2019). Consistent with the SPC's academic hearing procedures, Plaintiff was notified via email on January 2, 2020 that he was to meet with the SPC on January 6 "to respond to complaints of unprofessional behavior", that the most recent complaint was "one of a number of complaints regarding [his] behavior", that he should be prepared to explain himself and his behavior, and that his dismissal was a possible outcome of the meeting. (January 2, 2020 email). Dr. Loyke also verbally notified Plaintiff that the SPC would be reviewing all the complaints of unprofessionalism that had been made against him during his time at LMU-DCOM and Plaintiff acknowledged that he understood. (Dr. Loyke Decl. ¶ 10). Far from denying Plaintiff the basic elements of fairness, the SPC and LMU-DCOM's administration gave Plaintiff numerous opportunities and second-chances to correct and improve his academic deficiencies, lack of professionalism, and inappropriate behavior before finally dismissing him in January 2020 when he failed to correct his behavior.

b. Plaintiff cannot establish a causal connection between the outcome of the SPC hearing and gender bias.

Even if Plaintiff could show that his dismissal resulted from a "flawed outcome", which he cannot do, Plaintiff has not and cannot demonstrate a causal connection between this alleged flawed outcome and gender bias. To meet the second element of the erroneous outcome test, Plaintiff relies on the Sixth Circuit's decision in *Doe v. Baum,* 903 F.3d 575, 586 (6th Cir. 2018) to argue that LMU-DCOM showed gender bias by discrediting his testimony and the testimony of other male witnesses and crediting the testimony of female witnesses in reaching its decision. (Pl. Memorandum pp. 17-18). This reliance on *Baum* is misplaced. In *Baum*, the plaintiff was dismissed based on a claim of sexual misconduct arising from a sexual encounter when both he and the female complainant were intoxicated. *Baum*, 903 F.3d at 579-80. As part of the initial investigation into the complaint, the investigator interviewed twenty-three witnesses, with almost all the male witnesses testifying in the plaintiff's favor and almost all the female witnesses testifying in the complainant's favor. *Id.* at 579. The investigator concluded that the evidence did not support a finding of sexual misconduct and recommended that the administration rule in the plaintiff's favor and close the case. *Id.* at 580. The complainant appealed to the university's Appeals Board which reversed the decision of the investigator, finding that the complainant's description was more credible than the plaintiff's and that her witnesses were more persuasive. *Id.* The Sixth Circuit held that, when viewing the evidence in the light most favorable to the plaintiff, the Board's decision to credit exclusively female testimony and reject all of the male testimony was sufficient to set forth a plausible claim of gender bias for the plaintiff to survive a motion to dismiss. *Id.* at 586.

The *Baum* case is clearly distinguishable from the present action. As detailed above, Plaintiff was not dismissed following a disciplinary hearing into a single incident of misconduct

4606696.1

and the purpose of the January 6, 2020 SPC meeting was not to address only the December 20, 2019 anonymous complaint.  (*See* January 2, 2020 email).  The purpose of the SPC meeting was to address the fact that LMU-DCOM had received another complaint of unprofessional and inappropriate conduct that was similar to previous complaints and for which he been previously warned about and reprimanded on numerous occasions.  (*Id.*).  Unlike *Baum*, in which the Board specifically credited the testimony of female witnesses over male witnesses in making its decision, there is no evidence beyond Plaintiff's conclusory allegations that the SPC relied on any witness's gender in making any of the decisions which led to his dismissal.  To the contrary, the evidence shows that LMU-DCOM gave Plaintiff the benefit of the doubt when presented with potentially conflicting testimony or information on numerous occasions prior to his dismissal.[4]

Plaintiff also cannot rely on Dr. Loyke's alleged comment that he did not believe that women make up sexual harassment complaints and his alleged comparison of Plaintiff's denial to a murder or rapist professing innocence to prove a substantial likelihood of success on the merits of his Title IX claim.  As an initial matter, Dr. Loyke denies that he made these statements to Plaintiff.  (Loyke Decl. ¶¶ 15, 17).  Moreover, even if he did make these statements, these alleged isolated comments are not the kind of statements that courts have found to be sufficient evidence of gender bias.  *See, e.g. Saravan v. Drexel Univ.*, 2017 WL 5659821, at *4-6 (E.D. Pa. Nov. 24, 2017) (finding that plaintiff's allegations regarding numerous explicitly-biased anti-

---

[4] It is also important to note that the *Baum* decision involved an appeal following the district court's dismissal of the plaintiff's complaint on a motion to dismiss.  As such, the Sixth Circuit viewed the evidence in the light most favorable to the plaintiff in finding that "one plausible explanation" for the Board's decision to credit the testimony of the female witnesses and discredit the testimony of the males was due to gender bias.  *Id.* at 586.  This is a far lower standard of proof than required to show a substantial likelihood of success on the merits that is required to support a motion for preliminary injunction.  *See Doe v. Transylvania Univ.,* 2020 WL 1860696, at *5.

16

male statements by university investigative personnel *and* anti-male/pro-female university documents set forth plausible evidence of an erroneous outcome claim to survive a motion to dismiss); *Doe v. Brown Univ.*, 166 F. Supp.3d 177, 189 (D.R.I. 2016) (finding plaintiff's erroneous outcome claim could survive motion to dismiss based on allegations that: a university employee stated that the university treated male students "guilty, until proven innocent" and assumed its "always the boy's fault"; a professor stated "there is gender bias that is overwhelming at Brown" concerning sexual misconduct cases; and a professor agreed that the "culture of thinking" on the campus is that "males are bad" and "female are victims.").

In sum, Plaintiff has not and cannot cast doubt on the outcome of the SPC process or that there was any particularized causal connection between the SPC's decision and his gender. Plaintiff's conclusory allegations, even if taken completely as true, are barely sufficient to survive a motion to dismiss his Title IX claim. *See, e.g. Doe v. Vanderbilt Univ.,* 2019 WL 4748310, *7-9 (M.D. Tenn. Sept. 2019)(granting motion to dismiss Plaintiff's Title IX claim); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679-84 (M.D. Tenn. 2019) (same); *Doe v. Miami Univ.*, 882 F.3d 579, 593-94 (6th Cir. 2018) (affirming grant of motion to dismiss). They simply do not rise to the level necessary to establish a substantial likelihood of success on the merits of his Title IX erroneous outcome claim. *See Id.*

2.   <u>Plaintiff Cannot Show A Substantial Likelihood Of Success On The Merits Of His Breach of Contract Claim.</u>

Plaintiff's motion for a preliminary injunction should also be denied because he cannot demonstrate a substantial likelihood of success on the merits of his breach of contract claim. While Tennessee law does recognize that the student-university relationship is contractual in nature, courts have rejected a rigid application of contract law in this area. *See Sifuna v. South College of Tenn., Inc.*, 2017 WL 2062878, at *5 (E.D.Tenn. May 12, 2017) (*quoting Atria v.*

17

*Vanderbilt Univ.*, 142 Fed. Appx. 246, 255 (6th Cir. 2005)).  Moreover, the Sixth Circuit has adopted different standards of review when deciding decisions based on disciplinary issues versus academic criteria, declining to reverse a university's academic decision except when it can be shown to have acted in an arbitrary and capricious manner.  *Id.*  This requires a showing by the plaintiff "that there is no rational basis for the university's decision or that the decision was motivated by bad faith or ill will unrelated to academic performance." *Id.* (*citing Stevens v. Hunt*, 646 F.2d 1168, 1169 (6th Cir. 1981)).

Both the Sixth Circuit and this Court have held that university decisions based on professionalism in the medical context constitute academic decisions, not disciplinary decisions. *See Al-Dabagh v. Case Western Univ.*, 777 F.3d 355, 360-61 (6th Cir. 2015) (finding that the university's dismissal of the plaintiff for repeated professionalism issues following his receipt of a DUI was an academic decision, not a disciplinary decision, and must be reviewed using the arbitrary and capricious standard); *Sifuna*, 2017 WL at *8 (holding that the university's decision not to allow plaintiff to complete a clinical rotation due to her unprofessional conduct was an academic decision, not a disciplinary one).  Because Plaintiff cannot show that LMU-DCOM's decision was arbitrary and capricious, he cannot show a substantial likelihood of success on his breach of contract claim.

The record evidence demonstrates that LMU-DCOM dismissed Plaintiff on January 6, 2020 based on his repeated complaints of lack professionalism.  To show a substantial likelihood of success on the merits, Plaintiff must therefore establish that this decision was arbitrary and capricious.  *Id.*  This he cannot do.  Plaintiff relies exclusively on the SPC's alleged failure to follow the procedures for holding a disciplinary hearing set forth on pages 101-102 of the Student Handbook to argue that LMU-DCOM breached its contractual obligations to him.  (Pl.

4606696.1

Memorandum pp. 20-21). But the January 6, 2020 SPC meeting was not held pursuant to these guidelines as part of a disciplinary hearing. To the contrary, it was conducted pursuant to the procedures for conducting Academic Hearings set forth on pages of the Student Handbook. (January 2, 2020 email; Student Handbook pp. 62-64). Plaintiff has not alleged that the SPC failed to follow the procedures for conducting an Academic Hearing, nor is there any evidence in the record to support such an argument.

Plaintiff also cannot show that LMU-DCOM's decision had no rational basis or was motivated by bad faith or ill will. The record evidence demonstrates that LMU-DCOM's faculty and the SPC tried to work with Plaintiff to correct his academic deficiencies and lack of professionalism throughout his medical school career. (*See* SPC meeting minutes). The SPC and Dean Kessler gave Plaintiff numerous second-chances and placed him on academic and professionalism probation instead of dismissing him. (*See* October 25, 2016 letter). When the SPC received another professionalism complaint in July 2019 while Plaintiff was on probation, it decided to issue him a letter of admonishment instead of dismissing him at that time. (August 2, 2019 letter). When the SPC learned about additional complaints regarding Plaintiff's professional behavior during his clinical rotations similar to those he had exhibited throughout his time at LMU-DCOM, it had no choice but to dismiss him. The complaints were made by multiple individuals who worked at different facilities in different cities. There was nothing arbitrary or capricious about this decision.

3. <u>Plaintiff Cannot Show A Likelihood of Success On the Merits of His Negligence Claim.</u>

To prove a negligence claim under Tennessee law, a plaintiff must prove (1) a duty of care owed by the defendant to the plaintiff, (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty, (3) an injury or loss, (4)

causation in fact, and (5) proximate or legal causation.  *See Z.J.*, 355 F. Supp. 3d at 704.  It is well-established that where the alleged "breach of duty" relied upon by the plaintiff is a breach of contractual obligations, the action remains in contract.  *Id.* at 704-05 (dismissing plaintiff's negligence claim based on his allegation that university breached its duty to plaintiff by conducting an investigation into a sexual misconduct claim in a manner that was indifferent to the truth); *see, also Doe v. Vanderbilt Univ.*, 2019 WL at *19 (dismissing negligence claim because plaintiff did not identify a source of duty outside the relationship established by the Handbook and Sexual Misconduct Policy).

Plaintiff's negligence claim is based on his contention that LMU-DCOM owed Plaintiff a duty to investigate the December 2019 anonymous complaint and breached its standard of care by failing to do so.  (Pl. Memorandum p. 22-23).  As was the case in the *Z.J. v. Vanderbilt*  and *Doe v. Vanderbilt* decisions cited above, this is nothing more than an impermissible attempt to recast his breach of contract claim as a negligence claim.  *See Z.J.*, 355 F. Supp. 3d at 704; *Doe v. Vanderbilt Univ.*, 2019 WL at *19.  While Plaintiff contends that LMU-DCOM failed to investigate the anonymous complaint, he does not dispute that Dr. Loyke spoke with the complainant regarding her allegations.  (Verified Complaint ¶76).  In fact, Plaintiff contends that Dr. Loyke prepared a statement regarding this conversation and provided a copy of it to the SPC and Dean Kessler, and relies on this contention to support his claim that LMU-DCOM failed to follow the SPC's disciplinary hearing procedures set forth in the Student Handbook.  (Pl. Memorandum pp. 21-22).  This demonstrates that Plaintiff's real claim is not that LMU-DCOM failed to investigate the anonymous complaint, it is that it allegedly failed to follow its disciplinary hearing procedures in regards to how it handled the complaint.  (*Id.*).

4606696.1

In sum, courts have consistently found that a plaintiff cannot recast his breach of contract claim as a negligence claim. *See Doe v. Vanderbilt Univ.*, 2019 WL at *19. Because Plaintiff cannot establish that LMU-DCOM owed him any duty outside of the relationship established by the Student Handbook, he cannot show a substantial likelihood of success on the merits of his negligence claim. (*Id.*).

## C. Plaintiff Cannot Show That He Will Suffer Clear And Immediate Irreparable Harm If His Motion Is Denied.

To merit a preliminary injunction, "an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cty Schools*, 942 F.3d 324, 327 (6th Cir. 2019) (*quoting Mich. Coal. Of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (affirming district court's denial of motion for preliminary injunction)). Plaintiff contends that he will suffer irreparable harm in the absence of a preliminary injunction in that he will lose the opportunity to finish medical school and pursue his medical career until he is reinstated, his likelihood of matching in a residency program will be diminished, and he will suffer reputational harm the longer the dismissal is left uncorrected. (Pl. Memorandum pp. 14-15). While LMU-DCOM does not seek to diminish the potential consequences Plaintiff's dismissal may have on his potential medical career, Plaintiff's failure to seek a preliminary injunction for approximately six months refutes his claim that he will suffer immediate and irreparable harm in the absence of an injunction ordering LMU-DCOM to reinstate him prior to September 15, 2020.

LMU-DCOM dismissed Plaintiff on January 7, 2020. Plaintiff did not file the present action and motion for preliminary injunction until July 16, 2020. He did not seek an immediate preliminary injunction asking the Court to reinstate him in time to complete his final semester in the Spring of 2020 so that he could try to begin a residency program in the summer of 2020

instead of July 2021. By waiting to file this action until July 2020, Plaintiff will already have to explain to any potential residency programs why he did not complete his final semester of medical school in the Spring of 2020, especially since his academic record will show he was previously recessed from LMU-DCOM for academic reasons for the 2016-17 academic year. To the extent that Plaintiff contends his reputation will be damaged the longer this matter proceeds, LMU-DCOM does not oppose his motion to use a pseudonym during this litigation. Moreover, a preliminary injunction, regardless of the outcome, will not serve to end this matter. The risk that residency programs and others in the medical community will learn about Plaintiff's dismissal from LMU-DCOM the longer this litigation proceeds will not be diminished or negated by granting Plaintiff's motion for a preliminary injunction.

In short, Plaintiff may have personal or private reasons unknown to LMU-DCOM or the Court for waiting approximately six months to file his motion for a preliminary injunction.[5] But his reasons do not change the fact that Plaintiff cannot show that he will suffer certain and *immediate* harm in the absence of a preliminary injunction. *See Piere v. Univ. of Dayton*, 143 F. Supp.3d 703, 713 (S.D. Ohio 2015) (finding that "Plaintiff's delay in seeking a preliminary injunction undermines [his] allegation of irreparable harm.") (*quoting Wells Fargo v. WhenU.com, Inc.*, 392 F. Supp.2d 734, 773); *see, also Kendall Holdings, Ltd. V. Eden Cryogenics, LLC*, 630 F. Supp.2d 853, 867 (S.D. Ohio 2008) (finding that "[a] delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief.").

---

[5] It is important to note that LMU-DCOM dismissed Plaintiff on January 7, 2020, over two months prior to the shutdown related issues caused by the COVID-19 pandemic.

4606696.1

**D.** **A Balancing Of The Equities And The Public Interests Weigh Against Plaintiff's Motion For A Preliminary Injunction.**

Plaintiff argues that neither LMU-DCOM nor any third parties will suffer any potential harm if the Court orders him to be reinstated during the pendency of this action. (Pl.'s Memorandum p. 24). Courts have held, however, that universities have a substantial interest in the fair, prompt and accurate resolution of their internal proceedings without undue interference from the courts. *See Doe v. Transylvania Univ.*, 2020 WL 1860696, *12 (E.D. Ky. April 13, 2020). Universities are provided even more deference from the courts in situations, like the present, which involve academic decisions based on professionalism. *See Sifuna*, at 2017 WL *5.

LMU-DCOM has a duty and obligation to itself and to the public to ensure that its medical students and future doctors have and maintain the highest degree of professionalism as evidenced by the language emphasizing the importance of professionalism in its Student Handbook, including the fact that it reserves the right to dismiss a student at any time for professionalism issues. (Student Handbook pp. 61-64). The record evidence shows that Plaintiff had continuously exhibited a lack of professionalism and inappropriate behavior throughout his time at LMU-DCOM which he refused to correct despite being given numerous opportunities to improve and remedy these issues. Should the Court order LMU-DCOM to reinstate Plaintiff for his final semester of medical school, he will likely graduate and possibly move into a residency program prior to the final resolution of his lawsuit. Because of the serious and significant instances of lack of professionalism and inappropriate behavior exhibited by Plaintiff during his enrollment at LMU-DCOM, the potential harm to LMU-DCOM and the public should Plaintiff

be improperly reinstated is substantial and necessitates that such a decision be reserved until the case can be fully adjudicated on its merits.[6]

## IV.    CONCLUSION

LMU-DCOM dismissed Plaintiff following repeated complaints and instance of poor professionalism, academic deficiencies and inappropriate behavior which he refused to correct despite being given numerous opportunities to do so.  This decision and the process by which it was made was consistent with the applicable provisions of LMU-DCOM's Student Handbook.  These facts, among others, show that Plaintiff cannot establish a strong likelihood of success on the merits of his claims.  The fact that Plaintiff waited approximately six months following his dismissal to seek a preliminary injunction shows that Plaintiff will not suffer irreparable harm if his motion is denied.  Additionally, the record reflects that LMU-DCOM's and the public's interests weigh against the entry of an order requiring LMU-DCOM to reinstate Plaintiff prior to a final adjudication of his claims.  For these reasons, and the other reasons discussed herein, Plaintiff's Motion for Preliminary Injunction should be denied.

---

[6] Plaintiff's contention that he will forfeit the entire amount of his tuition payments and related costs if he is not reinstated, even if true, constitutes clear and quantifiable money damages that do not necessitate a preliminary injunction.

24

Respectfully submitted this the 10th day of August, 2020.

WOOLF, MCCLANE, BRIGHT
  ALLEN & CARPENTER, PLLC


/s/ J. Keith Coates, Jr.
J. Keith Coates, Jr., BPR #025839
Kaitlyn E. Hutcherson, BPR #035188

WOOLF, McCLANE, BRIGHT,
  ALLEN & CARPENTER, PLLC
Post Office Box 900
Knoxville, Tennessee 37901-0900
(865) 215-1000

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2020 a copy Lincoln Memorial University's Response in Opposition to Plaintiff's Motion for Preliminary Injunctions was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to Plaintiff's counsel as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Submitted this 10th day of August, 2020.

/s/ J. Keith Coates, Jr.
J. Keith Coates, Jr. (BPR No. 025839)