UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| John Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-315-DCLC-DCP |
| | ) | |
| Lincoln Memorial University, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY TO LMU'S RESPONSE TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

JAMES R. STOVALL, BPR # 32512
RITCHIE, DILLARD, DAVIES &
 JOHNSON, P.C.
606 W. Main Street, Suite 300
Post Office Box 1126
Knoxville, TN 37901-1126
Phone: (865) 637-0661
Fax: (865) 524-4623
email: jstovall@rddjlaw.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

**Page No.**

Introduction ................................................................................................................................1

Argument: A preliminary injunction is warranted that requires LMU to readmit Doe pending a trial on the merits ...................................................................................3

1. Doe is substantially likely to succeed on the merits of his claims .......................3

   A. By its plain terms, the DCOM Handbook treats allegations of sexual harassment as a "disciplinary" matter, and it does not authorize SPC to recommend dismissal, based even in part, on an anonymous allegation of sexual harassment ........................................................................................3

   B. Doe is substantially likely to succeed on the merits of his Title IX claim ..............7

   C. Doe is substantially likely to succeed on the merits of his breach of contract claim ..................................................................................................11

   D. Doe is substantially likely to succeed on the merits of his negligence claim ...................................................................................................12

2. Without an injunction, Doe will suffer irreparable harm ....................................14

3. The equities and the public interest weigh in favor of granting a preliminary injunction. ...........................................................................................................16

4. No bond is needed ...............................................................................................16

Conclusion ................................................................................................................................17

# INTRODUCTION

LMU's response confirms that Doe was dismissed in his final semester of medical school based, at least in part, on an anonymous allegation of sexual harassment. LMU also does not dispute (i) that Doe was not told who the anonymous complaint was or what he was supposed to have said to her, depriving him of meaningful opportunity to contest the allegation; (ii) that SPC did not question the complainant, much less allow Doe to question her; and (iii) that LMU credited the anonymous, hearsay allegation over Doe's in-person denial. Those undisputed procedural defects violated the express terms of the DCOM Handbook and the requirements of basic fairness. This means that Doe has a strong likelihood of success on his claims. Indeed, courts in this Circuit and elsewhere have enjoined the imposition of school sanctions arising from proceedings far less flawed.

LMU resists injunctive relief primarily on two grounds. Neither is valid.

First, LMU argues that the Handbook's disciplinary procedures did not apply to the SPC meeting at issue because LMU viewed the allegation of sexual harassment as a matter of "professionalism," and, according to LMU, "professionalism issues" are governed by the procedures for "academic deficiencies." This argument conflicts with the Handbook's plain language. Under the Handbook, "professionalism" standards are explicitly addressed as a matter of "conduct" or behavior, not academics. Indeed, the relevant conduct standards are set forth in a separate section of the Handbook titled "CONDUCT AND PROFESSIONALISM." Sexual harassment is addressed in this separate section, not in the academic-deficiencies section. And the sexual harassment policy in the Handbook explicitly provides that sexual harassment is subject, not to an academic sanction, but to "disciplinary action."

1

Interpreted as a whole, the Handbook makes clear that, when a professionalism issue involves accusations of inappropriate behavior or misconduct, including allegations of sexual harassment, the Handbook's disciplinary procedures apply. It is undisputed that those procedures were not followed here.

Second, LMU argues that Doe was dismissed based on a review of his entire disciplinary history at LMU-DCOM, not just a "single, anonymous allegation of sexual harassment." LMU's claim that there was a "pattern" of behavior gets things backwards. Although disciplinary history may be relevant in determining what sanction is appropriate for a violation, a punishment determination is properly made only after a violation has been established. As the Handbook puts it, "*[i]f* the committee determines that a violation has occurred then the deliberations will move into the penalty phase. *At this point*, any prior disciplinary problems will be provided to the committee." Handbook at 102 (emphasis added). Instead of determining whether any sexual-harassment violation occurred here, however, LMU just assumed that the allegations were true, and LMU's response, with its repeated reference to a "pattern," depends on this assumption.

Also, the documents LMU itself has submitted establish that, but for LMU's reliance on the anonymous allegation, Doe would not have been dismissed. The minutes of the SPC meeting at issue indicate that only two issues were raised by SPC at the meeting: two allegations of sexual harassment. The problem for LMU is that neither allegation was ever the subject of a disciplinary hearing. Indeed, the earlier allegation was investigated, Doe was found not to have violated the policy, and the matter was closed. The fact that LMU may have relied on two sets of hearsay allegations, not just one, is not a valid defense to any of Doe's claims.

Finally, LMU does not genuinely dispute that, absent an injunction, Doe's chance of matching with a residency program—and potentially of graduating from medical school at all—

2

will be substantially diminished. Although LMU faults Doe for not filing his lawsuit sooner, it neglected to inform the Court that, before filing suit, Doe attempted to resolve this matter by negotiations with LMU through counsel. That effort made sense, among other reasons, because given the timing of Doe's dismissal and internal appeal, he could not have started a residency this past July even if he had been reinstated in February.

Accordingly, a preliminary injunction should be granted (a) prohibiting LMU from enforcing its decision to dismiss Doe, and (b) requiring LMU to provide him the opportunity to finish his medical studies and graduate as a Doctor of Osteopathic Medicine.

# ARGUMENT

**A preliminary injunction is warranted that requires LMU to readmit Doe pending a trial on the merits.**

1. **Doe is substantially likely to succeed on the merits of his claims.**

   A. **By its plain terms, the DCOM Handbook treats allegations of sexual harassment as a "disciplinary" matter, and it does not authorize SPC to recommend dismissal, based even in part, on an anonymous allegation of sexual harassment.**

The defects in the SPC proceeding identified in the Verified Complaint and Doe's opening brief support all of Doe's claims. For example, procedural irregularities, including deviations from a school's written procedures, "cast doubt" on the accuracy of the proceeding's outcome, and, when the doubt is substantial enough, "can support an inference of sex bias." *Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020). And the deviations from the Handbook are of course at the heart of Doe's breach of contract claim.

LMU does not deny that the Handbook's disciplinary procedures were not followed. Instead, it argues that the disciplinary procedures did not apply because the January 2020 SPC meeting supposedly was governed by the "Committee Procedures for Academic Deficiencies." LMU's position is that SPC viewed the allegations against Doe as a "professionalism issue," and

3

LMU claims that, under the Handbook, any issue of "professionalism" is treated by the Handbook as an "academic deficiency," even when it involves allegations of sexual harassment. This argument contradicts the plain language of the Handbook and the rules of contract interpretation.

First, the Handbook expressly treats allegations of sexual harassment as a disciplinary matter, not an academic one, even when the allegations also raise questions of "professionalism." Although LMU focuses on one sentence in which the terms "academic" and "professionalism" appear together, the Handbook has a separate section that expressly addresses "CONDUCT AND PROFESSIONALISM." *See* Handbook at 76-85. This section provides, among other things, various behavior guidelines, rules about academic integrity, rules of "professional appearance," "professionalism standards in social media," and rules about "medical student/patient relationships." *Id*. And it is in this "Conduct and Professionalism" section, not the Handbook's academic deficiencies section, that sexual harassment is addressed. "General Conduct Policy Guideline" Number 14 provides that "[h]arassment of another person . . . is not tolerated," and refers to the Handbook's "Sexual Harassment Policy." Handbook at 76.

The "Sexual and Other Discriminatory Harassment" policy is also separate from the academic deficiencies section. *See* Handbook at 86-89. In the sexual harassment section, sexual harassment is explicitly described as conduct that is subject, not to an academic sanction, but to "disciplinary action." *See* Handbook at 86 ("Appropriate disciplinary action, up to and including suspension, expulsion, termination from employment or being banned from LMU properties, will be taken against individuals who violate this [sexual harassment] policy." (emphasis added)). According to the Handbook, because LMU has a "zero tolerance policy" for sexual harassment, "students are subject to discipline for any inappropriate behavior." Handbook at 89 (emphasis added).

4

Second, the SPC procedures for academic deficiencies do not authorize SPC to recommend dismissal based on an allegation that is disputed (much less an anonymous one). Rather, these procedures address situation involving bad grades—and only when the grade has already been assigned. Under these procedures, the committee "is to meet with the student and to discuss the grades that have been assigned by the course directors." Handbook at 62. Significantly, this section makes clear that, under the academic-deficiency procedures, factual disputes are to be resolved before a deficiency is heard by SPC. "All matters pertaining to how a grade was assigned must be resolved before the SPC meeting with the student." Id. Moreover, in the interest of "due process," if the student is challenging a grade, "the meeting will be put on hold until the issue pertaining to the grade is resolved." Id.

The section on academic deficiencies also specifies what sanctions SPC "may recommend" based on how many courses a student has failed. The authorized recommendations are different depending on whether the student in in the "preclinical years" (the first and second years of medical school) or the "clinical years" (the third and fourth years). For preclinical students who fail certain courses within a specified period, SPC may recommend that the student be dismissed from DCOM. For students in the clinical years who "fail one or more rotations," SPC may recommend that the student either (i) repeat the rotation; (ii) repeat all or a portion of the academic year; or (iii) be dismissed from DCOM. See Handbook at 63. The Handbook does not authorize SPC to recommend dismissal for any other circumstances that fall within the category of "academic deficiencies." See Handbook at 62-63.

LMU is correct that this section also mentions that SPC may meet with students "in addition to students who fail a course," including students who "receive negative comments on clinical rotations" or who "have any other academic or professionalism issue." Handbook at 62.

5

But nothing in this section suggests that all professionalism issues will be governed by the procedures for academic deficiencies. In fact, in the very next sentence—which is not mentioned in LMU's response—the Handbook explicitly says the opposite:

> Students accused of unethical behavior, such as dishonesty, theft, and violation of patient confidentiality, may also be referred to the SPC. (See Disciplinary Procedures in the LMU-DCOM Student Handbook).

Handbook at 62. Whatever else they may be, accusations of "unethical behavior" or "violation of patient confidentiality" are also "professionalism issues." Yet the academic-deficiency section itself explicitly provides that SPC hearings involving those accusations are governed by the Handbook's "Disciplinary Procedures." Id. Nothing in this section suggests that accusations of sexual harassment, which are no less serious than "violation of patient confidentiality," will be treated with any less procedural formality.

Finally, LMU's opposition to injunctive relief conflicts not only with the Handbook's plain language but also with the rules of contract interpretation. Three rules are particularly relevant here: the whole-text canon, the general/specific canon, and the rule of *contra proferentum*. When interpreting a contract or any other legal text, "[t]he text must be considered as a whole." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). Put differently, "the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph." *Parker v. Brunswick Forest Homeowners Ass'n*, No. W2018-01760-COA-R3-CV, 2019 Tenn. App. LEXIS 301, at *31-32 (Ct. App. June 13, 2019)

"It is also a 'well settled rule of contract interpretation that particular and specific provisions of a contract prevail over general provisions.'" *Vick v. Jefferson Cty. Bd. of Educ.*, No. 3:13-CV-730-TAV-CCS, 2016 U.S. Dist. LEXIS 131046, at *9 (E.D. Tenn. Sep. 26, 2016). "When a contract contains both general and specific provisions relating to the same thing, the

6

specific provisions control. Where uncertainty exists between general and specific provisions, the specific provisions will usually qualify the general." *Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009). And "contracts, if unclear or incomplete, are to be construed strictly against the drafter." *Betts v. Tom Wade Gin*, 810 S.W.2d 140, 143 n.4 (Tenn. 1991).

Here, LMU's interpretation is based on one sentence, read in isolation, that makes a general reference to "professionalism issues." It ignores the separate sections of the Handbook that specifically treat sexual harassment as a matter of "conduct and professionalism" that is subject to "disciplinary action." And since LMU drafted the Handbook, any lack of clarity in the Handbook about which "professionalism issues" are merely academic matters and which are also disciplinary matters is to be resolved against LMU.

Interpreted as a whole, the Handbook makes clear that, when a professionalism issue involves accusations of inappropriate behavior or misconduct, including allegations of sexual harassment, the Handbook's disciplinary procedures apply. It is undisputed that those procedures were not followed here.

**B. Doe is substantially likely to succeed on the merits of his Title IX claim.**

The procedural irregularities in the SPC hearing at issue not only "cast doubt" on the outcome of the proceeding, but also support an inference of gender bias. "[W]hen the degree of doubt passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias." *Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020). LMU's principal argument about Doe's Title IX claim—that there were no procedural irregularities because the Handbook was supposedly not violated—is addressed above. LMU's other arguments are addressed here.

7

First, LMU seems to assume that the outcome of a proceeding is doubtful only if the school's own procedures were violated. But Title IX is not so limited. Regardless of the express requirements of LMU's Handbook, the fact that LMU credited anonymous and hearsay allegations, over Doe's in-person denials, itself casts doubt on Doe's dismissal. As the Sixth Circuit has put it, sometimes the strongest evidence of gender bias is "the merits of the decision itself." *Doe v. Oberlin*. "[W]here decision-makers choose 'to accept an unsupported accusatory version over [that of the accused], and declined even to explore the testimony of [the accused's] witnesses,' this too 'gives plausible support to the proposition that they were motivated by bias." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 34 (2d Cir. 2019).

Second, LMU's argument that Doe was afforded "basis fairness" since he had been given "second chances" in the past lacks any merit. LMU identifies no authority for the novel proposition that a student who has been disciplined in the past is not entitled to any procedural protections if other accusations are made against him, especially allegations of serious conduct like sexual harassment. Regardless of what happened in the past, it violated basic fairness for LMU to credit anonymous or other hearsay allegations of sexual harassment, without any sort of investigative or adjudicatory process. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 608 (D. Mass. 2016) (holding that a student's claim that a private school denied him "basic fairness" was plausible because the school disciplined him for alleged sexual misconduct without giving him notice of the specific allegations against him, any right to confront or cross-examine the complainant, or any right to examine evidence or witness statements, among other defects). The lack of basic fairness is so glaring here that it supports an inference that Doe's dismissal was tainted by gender bias, regardless of what Dr. Loyke said to Doe (which will be addressed below).

8

Also, despite LMU's repeated references to a "pattern" of "inappropriate behavior," the minutes of the SPC meeting at issue indicate that SPC mentioned two issues, namely, the two allegations of sexual harassment. *See* [Doc. 17-18] at 2 ("Dr. Williamson stated it was concerning [Mr. Doe] being asked to leave two rotations in six months."). Neither of those allegations was ever found to be credible, and the second one was not investigated. Indeed, the fact that LMU may have relied on the first allegation of sexual harassment supports an inference of gender bias here. To do so, LMU had to disregard the conclusion of the Title IX investigator and the evidence that Doe submitted to him, including a statement from another male witness.

Third, LMU's argument that it did not violate Title IX because Doe was dismissed for "poor professionalism" is not valid. Even in its own response, LMU refers not just to "professionalism" but also to "poor professionalism, academic deficiencies and inappropriate behavior." *See*, *e.g.*, Resp. at 1, 12, and 24. LMU's repeated references to "inappropriate behavior"—the word "behavior" appears 29 times in its response—suggest LMU knows quite well well that sexual harassment is not merely a matter of "professionalism." In fact, under the Handbook, even if some "professionalism issues" may be treated as an academic matter, the Handbook has a specific section addressing sexual harassment, which provides that sexual harassment is subject, not to an academic sanction, but to "disciplinary action." *See* Handbook at 86, 89. As noted above, under Tennessee law, "[w]hen a contract contains both general and specific provisions relating to the same thing, the specific provisions control." *Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009). LMU's "conclusion that [Doe] had engaged in 'unprofessional conduct' derives from—and simply recharacterizes— the sexual harassment accusations" against him. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 35-36

9

(2d Cir. 2019). A university "cannot escape its promise of procedural protections by recharacterizing accusations of sexual misconduct in more generic terms." *Id.* at 37.

Fourth, reviewed carefully, Dr. Loyke's declaration does not deny that Dr. Loyke credited allegations from women over Doe's denials. Although Dr. Loyke denies that he told Doe that a woman would not make up an allegation of harassment, he does not deny that he believed the allegations here, even though he had not talked to one of the women and the other was anonymous, and even though he never interviewed Doe about the specific allegations. LMU also does not deny that Dr. Loyke made handwritten notes of his conversation with the anonymous complainant that were not provided to Doe. Those facts, coupled with the lack of any formal fact finding or credibility determination, establish a plausible inference that the outcome here was caused, at least in part, by gender bias.

Finally, the three decisions that LMU principally relies on (Resp. at 17) provide a useful contrast with the SPC proceeding here. In the first of those decisions, the student was disciplined only after the allegations were investigated and a written report, with specific credibility determinations, was prepared. *See Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 U.S. Dist. LEXIS 173269, at *38-39 (M.D. Tenn. Sep. 30, 2019) ("Vanderbilt conducted an investigation, interviewed witnesses (including John Doe and Jane Roe), and produced investigation reports that provided explanations of [the decision-maker's] consideration of the evidence, witnesses' credibility, and factual conclusions related thereto."). In the second, involving the same school, a similar procedure was followed—including an investigation that involved "two interviews of [the accused], written information and answers provided by [the complainant], the interview of one non-party witness, as well as a review of [police] reports, VUMC medical information, photographs and surveillance video"—and the accused student was presented with detailed

10

allegations at the beginning of the investigation and was given the opportunity to comment on the investigative report before it was finalized. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 668-71 (M.D. Tenn. 2018). And in the third decision, the student was disciplined after a hearing in which the complainant and other witnesses testified. *See Doe v. Miami Univ.*, 882 F.3d 579, 587 (6th Cir. 2018).

Despite the procedural protections that the student in the third decision was afforded, the Sixth Circuit still reversed the dismissal of the student's Title IX erroneous-outcome claim, in part because "the unresolved inconsistency in [the complainant's] statement, the unexplained discrepancy in the hearing panel's finding of fact, and the alleged use of an erroneous definition of consent creates 'some articulable doubt' as to the accuracy of the decision." *Id*. at 593. In short, LMU has not identified any authority for the notion that Title IX permits schools to resolve allegations of sexual harassment by crediting hearsay allegations without an investigation, or ever crediting, even in part, allegations that are anonymous. Doe has a substantial likelihood of success on the merits of his Title IX claim.

**C. Doe is substantially likely to succeed on the merits of his breach of contract claim.**

LMU's primary argument regarding Doe's contract claim—that the Handbook's disciplinary procedures do not apply to the anonymous allegation of sexual harassment—is addressed above. Doe's contract claim is supported not only by the Handbook's plain language, but also by the Handbook's implied covenant of good faith and fair dealing, which obligated LMU to provide Doe with "basic fairness." For LMU to dismiss Doe in his final year based on an anonymous allegation of sexual harassment, without giving him notice of what he was supposed to have said or done, deprived him of "basic fairness." *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 608 (D. Mass. 2016) (holding that a student's claim that a private school denied him "basic

11

fairness" was plausible because the school disciplined him for alleged sexual misconduct without giving him notice of the specific allegations against him, any right to confront or cross-examine the complainant, or any right to examine evidence or witness statements, among other defects).

LMU's argument that the dismissal was an "academic" decision entitled to great deference conflicts with the terms of the Handbook. As discussed above, in the Handbook, professionalism standards are set out, not in the academics or the academic-deficiencies sections, but in a separate section titled "Conduct and Professionalism." *See* Handbook at 76. And sexual harassment, far from being treated as a matter of academics, is addressed in a separate section that describes harassment as conduct that is subject to "disciplinary action." *See* Handbook at 86, 89.

In part for this reason, the two contract-claim decisions that LMU principally relies on are inapposite. *See* Resp. at 18. In one of them, the student handbook at issue "says professionalism is part of Case Western's academic curriculum at least four times." *Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355, 359 (6th Cir. 2015). In the other, the student was dismissed because she had been assigned an "F" in a clinical rotation, "which was clearly an academic decision." *Sifuna v. S. Coll. of Tenn., Inc.*, No. 3:14-cv-00515, 2017 U.S. Dist. LEXIS 72699, at *18 (E.D. Tenn. May 12, 2017). Moreover, neither of these cases suggests that a student may be dismissed based even in part on an anonymous allegation, regardless of whether the school decides to view the allegation as a "professionalism issue." In sum, because of the Handbook's plain language, and because the proceeding here lacked "basic fairness" by any measure, the merits of Doe's contract claim are strong.

### D. Doe is substantially likely to succeed on the merits of his negligence claim.

Doe's negligence claim is based on the fact that LMU failed to investigate the anonymous complaint of sexual harassment. Given the gravity of sexual misconduct allegations, it is

12

reasonably foreseeable that acceptance of such a complaint, without investigation, could lead to a medical student's wrongful dismissal. LMU disputes the merits of this claim essentially on two grounds. Neither carries the day.

First, LMU claims that Doe's allegations show that LMU did, in fact, investigate the allegations. LMU points out that the Verified Complaint alleges that Dr. Loyke spoke with the complainant regarding her allegations. That one conversation is hardly an "investigation," especially since Dr. Loyke never interviewed Doe about the allegations. Again, Doe did not even learn about Dr. Loyke's handwritten notes until after SPC had recommended his dismissal.

Second, LMU argues that any duty LMU owes to Doe arises from the Handbook and thus that Doe's negligence claim is merely a "recast" of his contract claim. Although some courts have accepted this argument, other courts have permitted student-plaintiffs to pursue contract and negligence claims arising from the same school sanction. *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 257 (6th Cir. 2005) (reversing summary judgment dismissing student's breach of contract and negligence claims); *Doe v. Univ. of the S.*, No. 4:09-cv-62, 2011 U.S. Dist. LEXIS 35166, at *55-58 (E.D. Tenn. Mar. 31, 2011). *See also Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 613-14 (D. Mass. 2016) ("John's status as a student does not necessarily preclude his negligence claim."). These decisions make sense because, as LMU acknowledges, "courts have rejected a rigid application of contract law" when dealing with student-university relationships. Resp. at 17. Also, contrary to LMU's argument, Doe's negligence claim is independent of the Handbook's disciplinary procedures. Even if those procedures did not apply here, it would still have been negligent for LMU to dismiss Doe based even in part on an anonymous allegation of sexual harassment. Doe's negligence claim, then, also has a strong likelihood of success.

13

### 2. Without an injunction, Doe will suffer irreparable harm.

As Doe's opening brief explains, without a preliminary injunction, Doe's chances of matching with a residency program will be significantly reduced, and he may lose the ability to graduate from medical school. LMU claims that these harms are "refuted" because Doe supposedly delayed in filing his lawsuit. This argument is wrong for two reasons.

First, contrary to LMU's suggestion that Doe was sitting on his hands for six months, before filing suit, Doe attempted to resolve this matter by negotiations with LMU through counsel. The negotiations took longer than they otherwise would because of the COVID-19 pandemic. Second, LMU's argument assumes that filing the lawsuit earlier this year would have allowed Doe to start a residency program in July. In fact, because Doe was not allowed to finish a rotation in December and was dismissed in January, he would not have been able to finish his remaining rotations before July 1st, even if he had been reinstated in February.

The timing of Doe's lawsuit, then, does not "refute" Doe's claim that, without an injunction, he will suffer irreparable harm. The cases cited by LMU do not show otherwise. Only one of them involved an academic sanction, and it was not a dismissal but a one-semester suspension. *See Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 706 (S.D. Ohio 2015). The other two were trademark or trade secrets cases. *See Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 867 (S.D. Ohio 2008); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 771-72 (E.D. Mich. 2003). In school-discipline cases, the weight of authority is that the consequences arising from a serious sanction are "irreparable" and justify granting injunctive relief, as the following list indicates:

- *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. Ohio September 25, 2017) (affirming injunction where, without injunctive relief, "Doe would be suspended for

14

a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing);

- Order dated June 14, 2019, *Doe v. Rhodes College*, W.D. Tenn., No. 2:19-cv-2336, [Doc 33], at 11 (finding "irreparable harms that favor" injunctive relief where student's expulsion "has already damages his reputation and may affect his ability to enroll at other institutions of higher education and to pursue a career")[1];

- *Doe v. Univ. of Conn.*, No. 3:20cv92 (MPS), 2020 U.S. Dist. LEXIS 11170, at *5 (D. Conn. Jan. 23, 2020) ("For a college student poised to graduate in a few months, it is highly likely that a two-year suspension and a sanction for sexual assault would indeed "forever change[]" the trajectory of his education and career.");

- *Roe v. Adams-Gaston*, No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697, at *46 (S.D. Ohio Apr. 17, 2018) ("In the absence of an injunction, Roe would continue to be expelled and suffer significant reputational harm based on the outcome of hearings in which she was denied the opportunity to cross-examine adverse witnesses."); and

- *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880, at *39 (S.D. Ohio Aug. 25, 2017) ("In university discipline cases, this Court has previously found sufficient irreparable harm to warrant a preliminary injunction where suspension and damage to reputation are at issue.").

The harms that Doe will continue to suffer because of the dismissal weigh in favor of granting an injunction.

---

[1] A copy of the *Rhodes College* order, which enjoined Rhodes from enforcing an expulsion, is attached.

15

### 3. The equities and the public interest weigh in favor of granting a preliminary injunction.

In addition to the interests identified in Doe's opening brief, the public has a strong interest in ensuring that "educational institutions comply with procedural due process and Title IX when seeking to achieve" an "educational environment" conducive to learning. Order dated June 14, 2019, *Doe v. Rhodes College*, W.D. Tenn., No. 2:19-cv-2336, [Doc 33]. LMU claims that there is a risk of "potential harm" to the public and LMU if Doe becomes a doctor because of the "lack of professionalism and inappropriate behavior" supposedly exhibited by Doe. But the alleged "behavior" that led to his dismissal not only is denied by Doe. It has never been the subject of any sort of fact-finding or adjudicatory proceeding whatsoever. LMU may be willing to rely on anonymous allegations and hearsay, but the Court certainly doesn't have to. LMU has not identified any legitimate concern that outweighs the interests that favor granting an injunction.

### 4. No bond is needed.

In its response, LMU does not raise any opposition to Doe's request that the requirement under Rule 65(c) to post a bond be waived.

## CONCLUSION

LMU's Handbook expressly provides that accusations of sexual harassment are subject to "disciplinary action." It is undisputed that LMU did not follow the Handbook's disciplinary procedures here. A preliminary injunction should be granted that prohibits LMU from enforcing its decision to dismiss Doe and requires LMU to provide him the opportunity to finish his medical studies, apply for a residency, and graduate as a Doctor of Osteopathic Medicine.

Respectfully submitted August 18, 2020.

RITCHIE, DILLARD, DAVIES & JOHNSON, P.C.

s/James R. Stovall
James R. Stovall [BPR # 032512]
606 W. Main Street, Suite 300
Knoxville, TN 37902
(865) 637-0661
jstovall@rddjlaw.com
